UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOANNA S., individually, and as Parent | : | |
| and Guardian of P.J. S., a Minor Child, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | C.A. No. 15-267M |
| | : | |
| SOUTH KINGSTOWN PUBLIC | : | |
| SCHOOL DISTRICT, and/or SOUTH | : | |
| KINGSTOWN SCHOOL COMMITTEE, | : | |
| Defendant. | : | |

### REPORT AND RECOMMENDATION

PATRICIA A. SULLIVAN, United States Magistrate Judge.

This case challenges the May 15, 2015, administrative decision ("the Decision") of a hearing officer pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq*. ("IDEA"). The Decision is focused on the seventh- through ninth-grade educational services provided by the South Kingstown Public School District ("the District") to a now-adolescent boy, referred to as P.J., who suffers from severe anxiety resulting in school phobia that caused him to miss significant portions of his education. The case is complicated by diagnostic disagreements among the many experts and educators who have taught, tested, observed or evaluated P.J. There are an array of opinions regarding whether he has mild autism, whether his educational "gaps" mask learning disabilities or simply reflect the need for remediation, whether he has dyslexia or another learning disability, and which of his many complex educational needs should be given priority.

The parties' dueling motions for summary judgment (ECF Nos. 10, 13) have been referred to me for preliminary review, proposed findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The District's cross-motion seeks an award of attorney's fees.

## I.    INTRODUCTION

P.J.'s mother, Joanna S. ("the Parent"), initiated the underlying administrative proceeding, known as a "due process proceeding," on August 1, 2014, just days before giving the District ten-days' notice of her intent send P.J. to the Gow School, a private boarding school in South Wales, New York.  See Complaint ¶ 25.  This is the third due process proceeding involving P.J.'s education since 2012.  The first proceeding resulted in a settlement between the Parent and the District in April 2012.  The second proceeding was initiated by the Parent to revisit issues addressed by the settlement.  The administrative ruling resulting from the second proceeding was appealed to this Court and to the First Circuit.[1]  The Parent has also filed at least four complaints with the Rhode Island Department of Education ("RIDE") regarding some of the matters in issue now.

A précis of the tale may briefly be told.  P.J. entered the South Kingstown School District midway through his fourth grade year (2009/2010) with diagnoses of anxiety disorder and autism spectrum disorder resulting in serious school phobia that had caused him frequently to miss school.  He received special education services without significant incident until sixth grade (2011/2012), when he refused to go to school at all.  The Parent then initiated the first due process proceeding, resulting in a settlement under which the District agreed to support P.J. at a private day school specializing in special education, the Wolf School,[2] for the 2012/2013 school

---

[1] The second due process proceeding resulted in three judicial decisions: S. Kingstown Sch. Comm. v. Joanna S., No. C.A. 13-127ML, 2014 WL 197859 (D.R.I. Jan. 14, 2014) (hereinafter "S. Kingstown I"); S. Kingstown Sch. Comm. v. Joanna S., 773 F.3d 344 (1st Cir. 2014) (hereinafter "S. Kingstown II"); S. Kingstown Sch. Comm. v. Joanna S., C.A. No. 13-127ML, 2015 WL 1915771 (D.R.I. Apr. 27, 2015) (hereinafter "S. Kingstown III").

[2] The Wolf School is a private special education day school for elementary and middle school students located in East Providence, Rhode Island, which uses an immersion model to provide integrated teaching of students of average cognitive potential who have multiple learning issues.  S. Kingstown I, 2014 WL 197859, at *3 n.4; P-271-11.  Among other difficulties, it addresses the needs of children who do not want to go to school and who have difficulty with reading and writing, and low frustration tolerance.  P-271-13.

year (seventh grade).  At the end of that year, at the Parent's request, the District agreed to

continue the Wolf School placement for eighth grade.  Because the Wolf School does not go past

eighth grade, the District developed a plan for the 2014/2015 school year and proposed three

placements: the District's alternative learning high school known as the Academic Success

Academy ("ASA");[3] School One; or the Providence Center School.  The Parent rejected all three

options and rejected the District's proposed Individualized Educational Plan ("IEP") as

inadequate.  On August 1, 2014, she initiated this, her third, due process proceeding, and, soon

after, unilaterally placed P.J. at the Gow School.[4]

In a nutshell, the Parent's due process complaint alleged that the District's proposals for

P.J.'s high school education were unacceptable, as well as that the District failed to afford P.J. an

IDEA-compliant free and appropriate public education ("FAPE") for seventh and eighth grade –

despite the District's acquiescence to her demand that P.J. be educated at the Wolf School for

most of the period in issue.[5]  As grounds for the latter claim, she relied, *inter alia*, on P.J.'s

"trivial" academic progress during both years at Wolf, the failure of the District properly to

---

[3] ASA is a newly developed educational alternative for high school students created by the District.  It is housed in a rehabilitated building near the general education high school building.  It provides education services in a small structured setting, staffed with regular and special education staff with the expertise to work with students, each at his/her own pace, including reading specialists, therapists (occupational and speech and language) and a school psychologist to provide therapeutic support.  Vol. XI at 1373; P-238.  Students placed at ASA can move seamlessly, as their educational and emotional needs permit, between the specialized, small-class structured environment at ASA and the least restrictive environment of the general education classes and extracurricular activities offered at the high school.  Vol. XI at 1373.

[4] The Gow School is a private school that serves children diagnosed with dyslexia and related language-based learning disabilities; it is neither a special education-certified school nor does it have any teachers with special education training and certification.  P-276-22-23; Vol. VII at 725-26.  There is no evidence in the record suggesting that severe anxiety or autism are diagnoses it is prepared to address.  See P-276-22-24.  The hearing officer found that the Gow School "provides an elite private school education in a rural setting with a small student population."  Dec. at 30.  Its location, South Wales, New York, is a hamlet in upstate New York, near to Lake Erie and the city of Buffalo, approximately five hundred miles from the District.  Dec. at 29-30; P-276-1; P-287 ¶ 1.

[5] The applicable statute of limitations cabins the period in dispute to the two years preceding the filing of the due process complaint on August 1, 2014.  20 U.S.C. § 1415(b)(6)(B); R.I. Code R. 21-2-54:E 300.507(a)(2).

incorporate the recommendations from an education evaluation into the eighth grade IEP, and the alleged lack of a legally sufficient transportation plan.  With respect to post-Wolf education, the Parent claimed that the District's plan for the ninth grade school year (2014/2015) was flawed for a blunderbuss of reasons, including that the primary basis of eligibility for special education was anxiety instead of autism.  Finally, she argued that the inappropriateness of the District's plan justified her unilateral decision to place P.J. at the Gow School, which she asserted was both an appropriate placement and the proper "stay-put"[6] during the due process proceeding.

These claims were addressed through a due process hearing that required eleven hearing days, between October 2014 and February 2015.  The hearing officer issued the Decision on May 27, 2015.  She held first that the IEPs implemented at the Wolf School for the seventh and eighth grades (2012/2013 and 2013/2014) provided P.J. with FAPE.[7]  Second, the hearing officer held that the District's proposal for ninth grade (2014/2015) would have provided P.J. with FAPE,[8] that ASA would be an appropriate placement and that the Parent's unilateral placement at the Gow School was not appropriate.  Third, the hearing officer held that the District's 2014/2015 IEP, to be implemented at ASA, would have provided an appropriate stay-put following P.J.'s graduation from the Wolf School.

The Parent has challenged every aspect of the Decision in this Court.  Underpinning all of her claims is her central assertion that she was not permitted meaningful participation in any of P.J.'s educational planning.  In addition, she asks this Court to rule on P.J.'s ongoing eligibility

---

[6] "Stay-put" is the IDEA-right of a parent to have the child remain in the "then current" placement during a due process proceeding.  20 U.S.C. § 1415(j).

[7] The 2012/2013 IEP is marked as Exhibit P-35.  The 2013/2014 IEP is marked as Exhibit P-115.  See also P-75 (version of 2013/2014 IEP used for examination of Ms. Seal).

[8] The last version of the 2014/2015 IEP is marked as Exhibit P-206.

for special education services provided by the District while he attends the Gow School at her expense.  The District opposes each link in the Parent's chain of argument.  As the prevailing party, it also seeks an award of attorney's fees pursuant to 20 U.S.C. § 1415(i)(3)(B)(i), based on its contention that the Parent and her attorney have continued to prosecute claims that are frivolous, unreasonable, without foundation or for an improper purpose.

Having thoroughly reviewed the entirety of the administrative record,[9] I find that the hearing officer did a masterful job of sifting through a complex array of evidence, making credibility determinations, weighing expert testimony, and crafting a comprehensive thirty-one page Decision.  In a case where so much was based on credibility determinations, her Decision is respectful to the Parent despite repeated findings – stated on the record during the hearing – that some of the testimony of the Parent and much of that of her educational advocate was implausible, strained credulity or lacked foundation.  Far from being a mere collection of conclusory statements unanchored to facts or credibility findings as the Parent contends, I find that the Decision is devoid of legal error, is based on thorough and careful fact-finding, is persuasive and well-reasoned and is entitled to the deference appropriate in an IDEA proceeding.

The analysis follows.

## II.    PROPOSED FINDINGS OF FACT[10]

---

[9] The due process hearing resulted in 1,448 transcript pages.  Marked and in the record are almost four hundred exhibits; of these, over one-hundred-sixty were admitted in evidence.  Four of the admitted exhibits are recordings of five of the thirteen IEP meetings, most lasting at least an hour, some two hours.  P-238; P-239; P-240; P-241.  Because there is no transcript of the recordings, a meaningful review of this record required the time to listen to these recordings, which are critical evidence of what really happened at the IEP meetings.  The hearing officer apparently listened to all of them.  So did I.

[10] These facts are drawn from the decisions that resolved the earlier due process proceeding (see n.1, *supra*) and from the record in this matter.  The hearing officer's Decision is cited as "Dec. at __."  For the hearing transcripts, the citation convention is "Vol. __ at __," while the exhibits are cited as they were marked during the hearing, with the Parent's exhibits labeled "P-__" and the District's exhibits labeled "R-__."  The parties' respective statements of facts are cited, for the Parent, as PSUF ¶ ___, and, for the District, DSDF ¶ __.

A.      **The Student**

The story begins with P.J., the child at the center of this emotionally charged dispute.

P.J. was ten years old when he entered the District's public schools; he is seventeen today.  To

the extent that he may be glimpsed through the thicket of adults sparring over his educational

challenges, he emerges as a boy, now approaching manhood, with an engaging personality,

intelligence and determination.  As one of his middle school teachers described him:

> He was a person that had several friends and had developed really nice, nice
> relationships with many of the middle school kids.  He was seen as a leader in the
> school and highly respected and valued within the community.  The little kids in
> the school just thought he was the best thing since sliced bread. . . . [H]is ability to
> present to others had blossomed.

Vol. I at 63.  Echoing others who testified, this teacher believed that P.J. has the potential

successfully to transition to college.  Vol. I. at 66.  She recounted an inspiring capstone

achievement in 2014, when P.J. stood before two hundred people and delivered a speech at the

Wolf School's graduation.  He received the Nelson Mandela award, given each year to a student

who excels in helping others.[11]  Dec. at 10; Vol. I at 63-64.

Cognitively, P.J. has consistently scored in the average, occasionally high average, range.

PSUF ¶ 1; P-4-2; P-94-4, 10.  One evaluator noted that such test scores "likely underestimate his

true level of cognitive ability."  P-127-4.  Various evaluators have diagnosed him with an array

of impairments, including anxiety disorder, mild autism or Asperger's syndrome, ADHD,

dyslexia, disorder of written expression, learning disorder (nonverbal processing, executive

functions), depression and anxiety.  PSUF ¶ 1.  While the experts debate which of these

diagnoses are correct and which diagnosis is dominant, there is no disagreement that P.J.'s most

---

[11] This teacher testified that P.J. "was such a peaceful soul," but also was "always trying to figure out how to make things work . . . [i]f there was someone having difficulties, [P.J.] was the man with the kids and Nelson Mandela was someone that we thought . . . he would have been similar to."  Vol. I at 64.

significant educational challenge has been school phobia caused by severe anxiety.  E.g., Vol. X at 1214-15; Vol. XI at 1411-12.  Because school phobia caused him to miss broad swaths of education, he has significant gaps in his mastery of foundational concepts such as phonics, spelling, decoding, writing and certain mathematical functions.  Vol. XI at 1374; P-238.  These gaps have left experts and educators struggling with two further conundra: how to fill the gaps without inflicting undue stress on P.J., and whether the gaps are masking learning disabilities, such as dyslexia.  See P-238; P-239.

With the educational foundation that P.J. received at the Wolf School, he now appears to be thriving in high school at the private school – the Gow School – where the Parent placed him.

### B.      The Other Dramatis Personae

To assist the reader, I set out below the other important characters in P.J.'s story.  For each, I have summarized the individual's relevant credentials and pertinent credibility findings and stated whether he/she gave expert testimony.

The Parent.  P.J.'s mother is an unflagging and zealous advocate for her son.  As will be noted, the hearing officer made a troubling number of adverse credibility findings concerning her testimony.

The Parent's educational advocate, Ms. Crescentia Brodeur.  The Parent hired Ms. Brodeur as an educational advocate in May 2013.  She is the chief executive officer of the company that also employs the Parent's attorney.  She has a bachelor's degree in rehabilitation psychology.  While employed by the Parent, Ms. Brodeur attended every IEP meeting and was paid at a rate of $500 per meeting.  Her preparation time was compensated at an undisclosed hourly rate.  Vol. III at 304.  The hearing officer was skeptical of Ms. Brodeur's independence and candor and made several adverse credibility findings regarding her extensive (three days)

sworn testimony.  Vol. III at 301-03; <u>e.g.</u>, Vol. IV at 464 (stating that advocate's testimony left her "incredulous").  The hearing officer declined to qualify Ms. Brodeur as an expert witness.

<u>The District's Director of Pupil Personnel, Ms. Teresa Eagan</u>.  Ms. Eagan testified for the South Kingstown School District.  She is the director of pupil personnel, in charge of special education and legal compliance.  Vol. IX at 956.  Her background includes two master's degrees (one in special education), twenty-six years' teaching, including middle and high school special education, ten years as a diagnostic prescriptive teacher doing educational evaluations, and fifteen years as an autism specialist.  Vol. XI at 1364-65.  She has extensive knowledge of the District's programs, especially the ASA, and has directly participated in P.J.'s educational planning, including attending ten or more of his IEP meetings.  <u>See</u> Vol. IX at 958; Vol. XI at 1369.  The hearing officer found her extensive testimony to be credible, and accepted her opinion on educational matters.

<u>The Wolf School's Director of Admissions, Ms. Rosaline Granoff</u>.  Ms. Granoff co-founded the Wolf School in 1999 and now serves as its director of admissions.  She also assists Wolf students with transition to high school.  Vol. XI at 1336-38.  She has a bachelor's degree in communication disorders, a master's in speech pathology and pre-doctoral certification in developmental neuropsychology.  Vol. XI at 1336.  While P.J. was at the Wolf School, Ms. Granoff monitored his progress and dealt directly with the Parent.  Vol. XI at 1339-1341.  The hearing officer made no adverse credibility findings regarding her testimony and accepted her opinion on educational matters.

<u>P.J.'s Wolf School mathematics/science and eighth grade homeroom teacher, Ms. Karen Seal</u>.  Ms. Seal was P.J.'s mathematics and science teacher for seventh and eighth grades and his homeroom teacher in eighth grade.  Vol. I at 6-8.  She has an undergraduate degree in elementary

education, a degree in natural resource economics and a master's degree in special education, as well as experience teaching mathematics and science.  Vol. I at 6-7.  Ms. Seal attended most if not all of P.J.'s IEP meetings and drafted goals and objectives that were incorporated into the IEPs.  Vol. I at 10-41.  The hearing officer made no adverse credibility findings regarding her testimony and accepted her opinion on educational matters.

P.J.'s Wolf School reading/social studies and seventh grade homeroom teacher, Ms. Maureen Gagne.  Ms. Gagne is a special education teacher who has been teaching since 1977, at the Wolf School for five years.  Vol. X at 1161, 1163.  She taught P.J. reading, writing, literacy and social studies for two years and was his homeroom teacher in seventh grade.  Vol. X at 1163.  Her undergraduate degree is in elementary and special education, and her master's degree is in resource teaching.  Vol. X at 1162.  She is certified for elementary and middle school mild-to-moderate special education and as a resource teacher.  Vol. X at 1162-64.  She participated in many of P.J.'s IEP meetings and wrote his IEP goals and objectives for literacy, reading and writing.  Vol. X at 1165, 1168.  The hearing officer made no adverse credibility findings regarding her testimony and accepted her opinion on educational matters.

The Gow School's Director of Admissions, Mr. Douglas Cotter.  Mr. Cotter has a bachelor's degree in history.  Vol. VII at 706-25.  The hearing officer made no adverse credibility findings regarding his testimony; he did not purport to testify to any opinions.

P.J.'s treating therapist, Dr. Duncan Smith.  Dr. Smith[12] is a clinical social worker who met with P.J. for weekly therapy beginning in 2012 until he left Rhode Island to attend the Gow School in the fall of 2014.  Vol. II at 90, 95; P-235.  Dr. Smith has twenty years of experience in

---

[12] Dr. Smith has a master's degree in social work.  His qualification meriting the sobriquet "Dr." is not relevant – he has a doctorate in German and European Studies, and presently teaches at Brown University.  P-235.

counseling.  During one seven-year period of his career, he provided counseling services for children with autism.  Vol. II at 88.  The hearing officer made no adverse credibility findings regarding Dr. Smith's testimony.  She accepted him as an expert regarding matters within his purview, although she limited her reliance on certain of his opinions based on the lack of an adequate foundation.

Educational expert, Dr. Andrea Kotula.  Dr. Andrea Kotula was engaged by the District at the Parent's request to perform a one-day educational evaluation of P.J. in August 2013.  Vol. III at 251.  She has a bachelor's degree in sociology and writing, a master's in remedial reading, a doctorate from Harvard in reading, language and learning disabilities, and extensive experience working in schools in Rhode Island, Massachusetts, New York and New Jersey.  P-232.  Dr. Kotula was qualified and testified as an expert.

Neuropsychologist, Dr. Brett Leimkuhler.  Neuropsychologist Dr. Brett Leimkuhler evaluated P.J. at the Parent's expense on November 27 and December 4, 2013.  P-127.  He has a Ph.D. in clinical psychology from the University of Rhode Island, and thirty years of experience in private and hospital-based practice.  Vol. III at 193; P-233.  Dr. Leimkuhler was qualified and testified as an expert.

Neuropsychologist, Dr. Dana Osowiecki.  Neuropsychologist Dr. Dana Osowiecki was engaged as a consultant by the District to review P.J.'s case in the fall of 2014.  Vol. X at 1239-40.  Dr. Osowiecki has a Ph.D. in clinical psychology from the University of Vermont and did a post-doctoral fellowship in child neuropsychology at Brown University; her professional experience includes sixteen years in private practice evaluating children with depression, anxiety, autism and attention deficit hyperactivity disorder ("ADHD").  R-R.  She specializes in treating children with autism, anxiety and executive functioning disorders and has served as a

consultant to numerous school districts.  R-R; Vol. X at 1207-09.  Dr. Osowiecki was

compensated by the District at her usual hourly rate of $150 per hour.  Vol. X at 1259-60.

Although she did not evaluate or observe P.J. directly, she was qualified and testified as an

expert regarding her opinions based on her review of P.J.'s file, including the expert reports and

testing results, and her knowledge of the ASA program.

C.    **What Happened**

i.    **Background – 2009 Evaluations**

To set the events in issue in context, it is necessary to go back to March 2009, when P.J.

was nine and living in North Kingstown, prior to moving to his present home.  At that time, two

psychologists, Dr. Larry Hirshberg and Dr. Christine McGrath, performed a neurodevelopmental

assessment.  Their report notes a divergence between the Parent's reports of serious difficulties

with P.J. at home, and those of his teachers, who reported that he was functioning normally at

school.  P-3.  The resulting report concludes that P.J.'s home-based deficits fall within the

definition of autism spectrum disorder, but does not diagnose autism.  P-3-2; P-4-2.

When P.J. was ten, his family moved to South Kingstown.  Vol. XI at 1366; see PSUF ¶

1.  At that time, although he was on track academically, due to his severe anxiety about attending

school, he was placed for forty-five-days at a therapeutic day school operated by the Bradley

Hospital, a children's psychiatric hospital (the "Bradley School").  Dec. at 3; Vol. XI at 1366;

see P-4-1 ("P.J. would refuse to enter school and could persist for hours").  The purpose of the

Bradley placement was to provide educational services and to obtain a diagnostic evaluation

based on psychological and psychoeducational testing and observation by experts.  P-4-2.

In the resulting report dated September 15, 2009, the Bradley team recorded similar

findings to those in the Hirshberg/McGrath report, in that, while the Parent rated P.J. as

functioning in the range to support a diagnosis of autism, Bradley's observations did not support

a diagnosis of autism.  P-4-2.  Rather, anxiety seemed dominant.  P-4-2.  The Bradley team

observed that P.J. was bright, conscientious, sought praise and positive attention, was appropriate

with peers and adults, made many new friends, shared his interests with peers, and had

educational achievements that were at or near grade level, except for phonemes, spelling and

writing.  P-4-3; see P-4-5.  While at Bradley, P.J.'s most serious behavioral difficulty –

transitioning from home into school – improved each day; although he was tardy, he never

missed school.  P-4-3-6.  After staff observed that P.J. was reluctant to separate from the Parent

in the morning, yet there were "no signs of difficulties riding the bus home in the afternoon," a

contract was set up, whereby P.J. got free time if he came to school by bus.  By the time he

completed the Bradley School program, P.J. was successfully riding the bus both ways.  P-4-4-5.

According to the Bradley evaluation, "[i]t is difficult to be definitive regarding P.J.'s

diagnosis."  P-4-6.  Based on P.J.'s extreme difficulty in separating from his parents and his fear

of negative evaluations, social relationships and new situations, the Bradley report diagnosed

anxiety disorder.  P-4-7.  Despite the Parent's report of communication issues, restricted interests

and impaired social interaction, neither his public school teachers (in North Kingstown) nor the

Bradley educators observed any of those difficulties; as a result, the Bradley staff declined to

diagnose autism.  P-4-7.  Rather, noting the report of severe behavioral difficulties at home,

Bradley diagnosed disruptive behavioral disorder and parent-child relational problem.  P-4-7.

A third psychological evaluation was performed in November 2009, again by Dr.

Hirshberg, the psychologist who had collaborated on the March 2009 evaluation.  P-94-3.  This

report contains the same discrepancies between the home-based observations and those from

teachers.  Id.  While noting the difficulty created by the discrepancies, Dr. Hirschberg diagnosed

autism spectrum disorder.  Id.  He also underscored P.J.'s "protracted school refusal."  Id.

ii.     **Educational Disputes Leading Up to and During Early Phase of Wolf School Placement**

a.     2009/2010 through 2011/2012 School Years – the First Due Process Proceeding and the 2012 Settlement Agreement

Following the Bradley placement and the move to South Kingstown, P.J. entered the

District's public schools in January 2010 as a fourth grader.  PSUF ¶ 1; Vol. XI at 1366.  He was

determined to be eligible for special education services.  PSUF ¶ 2.  As far as the record tells the

tale, he did well for the balance of the 2009/2010 school year and the 2010/2011 school year

(fourth and fifth grades) in an alternative learning program.  Dec. at 4; Vol. XI at 1366-67.

However, starting in sixth grade, P.J.'s extreme resistance to going to school caused his school

attendance steadily to decline until he stopped going completely in February 2012.  PSUF ¶ 3;

Vol. XI at 1367.  P.J.'s therapist opined that he was experiencing "intense anxiety."  P-8.  The

District offered many accommodations as the situation worsened, including homebound

instruction with a certified special education teacher; nothing worked.  Dec. at 4; Vol. XI at

1367; PSUF ¶¶ 3-4; PSDF ¶ 4.

At an IEP meeting held on February 12, 2012, P.J.'s resistance to attending school was

the principal topic.  S. Kingstown I, 2014 WL 197858, at *2.  Soon thereafter, on February 17,

2012, the Parent filed her first due process complaint, claiming that P.J. had Asperger's disorder,

social anxiety disorder, agoraphobia and depression.  As a result, she asserted that he was

eligible for special education and related services and asked that he be placed in a small private

school.  She also asked the District to pay for eight new evaluations, tuition for summer camp,

karate lessons, private tutoring and attorney's fees.  S. Kingstown I, 2014 WL 197858, at *2-3;

PSUF ¶ 5.  After a hearing officer was assigned to conduct an evidentiary proceeding, the Parent and the District began a resolution process.  S. Kingstown I, 2014 WL 197859, at *3-4; see 20 U.S.C. § 1415(f)(1)(B)(iii); 34 C.F.R. § 300.510; R.I. Code R. 21-2-54:E § 300.510.  During these negotiations, the Parent advocated for placement at the Wolf School, while the District urged a therapeutic placement, such as the Bradley School.  Dec. at 21, 25; Vol. XI at 1367.

Ultimately, the District capitulated.  On April 18, 2012, the parties signed the settlement agreement.  R-A ("Settlement Agreement").  It acknowledged P.J.'s eligibility for special education; accepted the Parent's choice of placement at the Wolf School if it would accept him; required the District to pay Wolf's tuition for the balance of the 2011/2012 school year and the 2012/2013 school year (seventh grade); adopted the Parent's request for extended school year services ("ESY") during the summer of 2012, at Wolf if possible; and provided for payment of the Parent's attorney's fees.  R-A.  The parties compromised on evaluations, agreeing that the District would immediately perform four, but not eight.  Dec. at 21; R-A.  The Settlement Agreement also addressed transportation.  In light of P.J.'s anxiety about riding the school bus, and with the Wolf School posing a particular challenge because of its distance from P.J.'s home, the Settlement Agreement provided that the District would not be responsible for transportation until the start of the 2012/2013 school year.  Throughout that school year, the District would arrange transportation, but, if P.J. refused to ride the school bus, the Parent would be responsible for getting him to school.  R-A ¶¶ 1(H, F).  After the parties executed the Settlement Agreement, the Parent's attorney's fees were paid, the pending due process proceeding was dismissed with prejudice, the four evaluations were initiated and the Wolf School was contacted about whether it would accept P.J. for May 2012, for the summer of 2012 and for the 2012/2013 school year.  S. Kingstown I, 2014 WL 197859, at *3; see P-25.

        b.      The Settlement Agreement, the Second Due Process
               Proceeding and the First Round of Federal Court Litigation

Unfortunately, the Settlement Agreement seemed to exacerbate the disagreements between the Parent and the District. S. Kingstown I, 2014 WL 197859, at *9-12; S. Kingstown II, 773 F.3d at 352-55; PSUF ¶ 6. The first dispute arose over what services the District would provide for the balance of the 2011/2012 school year after the Wolf School declined to enroll P.J. for just May, because such a short matriculation would be too disruptive. The District offered the Bradley School or Mount Pleasant Academy. The Parent demanded homebound instruction, which the District refused to provide.[13]  Vol. XI at 1368.

At first, matters progressed better with respect to the 2012 summer and the 2012/2013 school year. The Wolf School accepted P.J. for seventh grade; on May 4, 2012, it so advised the Parent in writing.[14]  Wolf also agreed to provide ESY for the summer of 2012. Based on Wolf's acceptance of P.J., the District interpreted the Settlement Agreement as permitting a delay of the IEP meeting to develop a plan for the 2012/2013 school year. DSDF ¶ 12; see R-A ¶ 1(C). As Ms. Eagan testified, P.J. would receive ESY at Wolf and the District would perform the four

---

[13] This dispute occurred prior to the period now in issue. Because the Parent argued that Wolf's refusal to accept P.J. for May 2012 was relevant to what followed, the hearing officer considered the testimony and examined the evidence. See P-11; P-12. She found that the District complied with its obligations under both IDEA and the Settlement Agreement and that P.J.'s failure to go to school during May 2012 was the result of the Parent's refusal to accept an appropriate placement. Dec. at 25 (referring to R-A ¶ 1(I)). While not strictly relevant to what is before this Court, I find no error in this finding.

[14] Before the hearing officer, the Parent initially testified that she was not told that P.J. had been accepted by the Wolf School for the full school year of 2012/2013 and that P.J. wrote a suicide note as a result of the uncertainty. Vol. VIII at 930-31. Her attorney argued that P.J.'s extreme reaction to not knowing if he would start as a Wolf student in September constitutes a "changed circumstance" that voided the Settlement Agreement pursuant to S. Kingstown II. Vol. VIII at 922-23. Subsequent hearing testimony unambiguously established that Wolf accepted P.J. almost immediately, both for the summer and the full 2012/2013 school year, and that a written acceptance communication was sent to the Parent on May 4, 2012. Vol. XI at 1340, 1369. In the face of this evidence, the Parent recanted, admitting that she learned that P.J. had been accepted at Wolf for the entire 2012/2013 school year shortly after the Settlement Agreement was signed. Vol. X at 1270; see also P-11-1 (May 9, 2012, letter from P.J.'s therapist confirms that, "[P.J.] has been accepted to the Wolf School for the next academic year"). No medical evidence to corroborate the claim of suicidality was presented.

evaluations during the summer of 2012; in September, P.J. would matriculate at Wolf, which administers its own evaluations and assessments during the first forty-five days of the school year.  See Vol. XI at 1351-52.  As soon as all of the pertinent evaluations, assessments and observations were collected, an IEP meeting would be held, in the late fall of 2012, to formulate a plan.  Vol. XI at 1359, 1382-90.  Pursuant to the Settlement Agreement, P.J. received tutoring and other services at the Wolf School during the summer of 2012, for which the District paid.[15] Vol. XI at 1368-69.  The District performed, or attempted to perform, the four evaluations.  It was able to complete three; the educational evaluation was not completed due to P.J.'s anxiety, despite the efforts of the examiner.  P-25; S. Kingstown I, 2014 WL 197859, at *4.

The next disputes regarding the Settlement Agreement erupted over the timing of the IEP meeting and the need for more evaluations.  The Parent declined to wait for the Wolf School educators to complete their forty-five-day assessment.  Instead, she requested an earlier IEP meeting, which was held on October 9, 2012.  S. Kingstown I, 2014 WL 197859, at *4; Vol. IX at 1044-51.  At the very end of this IEP meeting, she made an abrupt oral request for independent do-overs not just of all of the four evaluations already done or attempted, but also for up to twelve more evaluations, and for specialized transportation.  S. Kingstown I, 2014 WL 197859, at *4 n.6.  The latter demands were directly contrary to the Settlement Agreement.  S. Kingstown I, 2014 WL 197859, at *4.  Then, despite the just-signed Agreement in which she acquiesced to

---

[15] The evidence clearly establishes that P.J. received summer services at Wolf in 2012.  E.g., Vol. XI at 1368-69. During the administrative proceeding and in this Court, the Parent's attorney persistently asserted that no services were provided in the summer of 2012 to support her argument that "changed circumstances" voided the Settlement Agreement.  Vol. VIII at 923 ("And he was supposed to get extended school services, and it's our position he didn't receive those either."); ECF No. 10-1 at 3 ("P.J. also did not receive any extended school year services over that summer").  This argument is frivolous.  See Vol. XI at 1341 (Wolf director of admissions testifies that P.J. received educational services at Wolf during summer of 2012).  The hearing officer's finding that the District complied with its obligation to provide ESY in the summer of 2012 is well founded.  See Dec. at 5.

16

four evaluations, she described herself as "extremely concerned" when the District refused to

perform twelve more.[16]  P-38.

    As required by the applicable regulations, the District promptly initiated the second due

process proceeding on October 30, 2012.  34 C.F.R. § 300.502(b)(2); R.I. Code R. 21-2-54:E §

300.502(b)(2).  The resulting administrative hearing, followed by proceedings in this Court,

resulted in the holding that the Settlement Agreement should have been given appropriate effect

and that no additional evaluations were required, beyond a do-over of the incomplete educational

evaluation, because there were "no new circumstances that were not knowable at the time of the

Settlement Agreement."  S. Kingstown I, 2014 WL 197859, at *14, 16-18.  The First Circuit

affirmed.  S. Kingstown II, 773 F.3d at 356-57.  To clarify how to interpret a Settlement

Agreement in the IDEA context, the First Circuit held that the district court must examine the

scope of the settlement and give it appropriate effect consistent with the intent of Congress that

parties may resolve educational disputes through settlements.[17]  Thus, a parent may request a

service barred by a settlement if the need is based on "a change in the conditions that prevailed at

the time of [the settlement]."  S. Kingstown II, 773 F.3d at 354-56 ("IDEA settlements may not

bargain away "the statutory right to a free and appropriate public education.").  Because the only

claim of a "changed circumstance" was P.J.'s extended absence from school, which the First

Circuit rejected, the Court held that "the Settlement Agreement relieves the School Committee

---

[16] The District refused partly based on the Settlement Agreement.  It also refused because the educators believed that so many evaluations were unnecessary and could be harmful to a child as anxious as P.J.  S. Kingstown I, 2014 WL 197859, at *5 ("with a student with high anxiety, to put him under a microscope and put him in that situation would cause really undue stress, where the real way you can understand and see a child is in the natural setting with curriculum-based measures"); id. (school psychologist testified, "I don't see a need, especially for a youngster who experiences so much difficulty in those situations.").

[17] The First Circuit noted that the "'[r]es judicata is a doubtful label' to use in the context of a settlement of an administrative proceeding" – rather, "'the label does not matter; the question is the scope' of the Settlement Agreement."  S. Kingstown II, 773 F.3d at 353 & n.4 (quoting Martinez-Vélez v. Rey-Hernández, 506 F.3d 32, 45 (1st Cir. 2007)).

from having to pay for, or conduct, the psychoeducational evaluation the Hearing Officer

ordered." S. Kingstown II, 773 F.3d at 355.

c.        Complaints to Rhode Island Department of Education

While the interpretation of the Settlement Agreement was being litigated in the second

due process proceeding and in federal court,[18] the Parent filed multiple complaints against the

District with RIDE, some of which resulted in findings of procedural IDEA violations.  For

example, in February 2013, RIDE found viable the Parent's claim that the District failed to give

her prior written notice of a November 13, 2012, IEP meeting and that the District was out of

compliance in postponing P.J.'s 2012/2013 IEP meeting until after the start of the 2012/2013

school year.  P-62.  In response to another complaint, in April 2013, RIDE found that the Parent

was not given a meaningful opportunity to participate in the October 9, 2012, IEP meeting

because it was ended prematurely; it rejected the Parent's complaint that she was wrongfully

denied evaluations.  P-73.  And in September 2013, RIDE rejected the Parent's complaints

regarding the District's refusal to pay for Dr. Kotula to attend an IEP meeting, and the attendance

of the District's counsel at IEP meetings.  R-Z.

iii.     **Educational Disputes Regarding the Wolf School Placement**

We arrive – at last – at the first of the core matters now in issue, the Parent's challenge to

the education services provided at the Wolf School, which she contends were so inadequate that

P.J. did not receive FAPE during any of his time there.

a.        Parent's Claim that She Retained the Right to Reject and
          Never Agreed to the Wolf School Placement

---

[18] The other arena in which the Settlement Agreement appears to be the subject of litigation is the Rhode Island
Superior Court.  There is a suggestion in the hearing record that the Parent has sued the District in state court for
breach of the Settlement Agreement.  Vol. XI at 1391.

18

In recognition that the Settlement Agreement is a significant impediment to her frontal attack on the quality of the Wolf School's educational services, during the due process proceeding, the Parent made the newly-minted argument, never asserted while the events were unfolding, that the Settlement Agreement, properly interpreted, actually meant that she did not agree that P.J. could be placed at the Wolf School.  Her reasoning proceeds as follows – if Wolf did not accept P.J. for the stub of the 2011/2012 school year (which it did not), paragraph 1(I) of the Agreement required that whether P.J. should go to Wolf in the fall was to be discussed at an IEP meeting to be held prior to August 2012.[19]  The District's failure to hold that meeting denied her the right to press her true opinion (contrary to her advocacy for Wolf during the first due process proceeding) that Wolf was not appropriate *ab initio*.  PSUF ¶¶ 8-9.

The hearing officer rejected as utterly lacking in credibility the construct that the Parent always had believed that the Wolf School was inappropriate for her son.  Her skepticism, as expressed to the Parent's counsel towards the end of the due process proceeding, is plain:

> [Ms. Eagan]'s already testified that the mom requested placement at Wolf.  They acquiesced through a court settlement, because P.J. had well documented anxiety and social/emotional issues which he further exhibited through school avoidance. . . . The fact that he wasn't in school, you brought a suit or somehow the case got into litigation, again, there was a Settlement Agreement by which the mom requested Wolf, he was placed there, and now it seems like you want to say, well, why did you place him there.

Vol. IX at 1054.  The hearing officer's well-founded rejection of this position, and the Parent's testimony in support of it, is corroborated by many, many record references establishing that the Parent wanted P.J. to attend Wolf for seventh grade.  See Dec. at 20.  And beyond the record for

---

[19] The Parent is right that the relevant provision of the Settlement Agreement is very confusing; the words permit this illogical interpretation.  R-A ¶ 1(I).  Read holistically and with common sense, in light of the extrinsic facts as found by the hearing officer, I find that this provision actually was meant to require a pre-August 2012 IEP meeting only if the Wolf School rejected P.J. for the 2012/2013 school year.  The pre-August 2012 IEP meeting requirement was mooted when the Wolf School sent the May 4, 2012, acceptance letter.

the instant proceeding, the hearing officer's finding, that the Parent's position that she never

believed that Wolf was appropriate is an after-the-fact concoction to support her current attack

on P.J.'s Wolf education, is also corroborated by findings from the second due process

proceeding where the Parent's own expert, Dr. Imber, opined that the Wolf School is "a good

placement" and "beautiful" for P.J.  S. Kingstown I, 2014 WL 197859, at *17; S Kingstown III,

2015 WL 1915771, at *11.

> b.   P.J.'s 2012/2013 and 2013/2014 Education at the Wolf
> School – Educational Progress

P.J. matriculated at the Wolf School in September 2012 as a seventh grader.  The IEP for

the school year was dated October 9, 2012.  P-35.  In it, P.J.'s eligibility for special education

services was based on "emotional disorder due to his anxiety causing physical symptoms or fears

associated with personal or school problems."  P-41; see 34 C.F.R. § 300.8(c)(4)(i)(E)

(emotional disorder defined as "tendency to develop physical symptoms or fears associated with

personal or school problems").  During the 2012/2013 school year, the District complied with its

obligations to support P.J. at the Wolf School, to pay for the educational evaluation, which was

completed by Dr. Andrea Kotula, and to hold the many IEP meetings requested by the Parent.

Meanwhile, once he was at Wolf, P.J. began attending school regularly, making friends and

gaining confidence.  By the end of P.J.'s first year at the Wolf School, the Parent was so satisfied

with the educational services he was receiving that she demanded that the District continue the

placement for eighth grade, threatening to invoke her rights to stay-put at Wolf if the District did

not agree.  Vol. IX at 1112-23; see P-238 (during September 24, 2013, IEP meeting, Parent

threatens stay-put at Wolf); P-133 (Parent input of December 10, 2013, praises Wolf educational

benefits); P-239 (during December 17, 2013, IEP meeting, Parent states that Wolf School is "what he needs, that's what he will succeed at").

Even though its obligations under the Settlement Agreement had been fully performed at the end of the 2012/2013 school year, based on its belief that the Wolf School was properly implementing P.J.'s IEP and affording him FAPE, the District acquiesced to the Parent's demand to keep P.J. at Wolf for another year. Dec. at 5; Vol. IX at 986. And at the end of that year, as P.J. was completing eighth grade, the Parent continued to be so pleased with Wolf that she used its educational program as the basis for her stay-put demand while the current due process proceeding was pending. In her decision, the hearing officer quoted an email from the Parent to Wolf officials, written in May 2014, in which she wrote, "[P.J.] has been successful at Wolf and has directly benefited from your program, and he cannot have anything less going forward." Dec. at 20 (quoting P-184).

The three testifying Wolf educators all confirmed that P.J. made meaningful – "steady" – academic progress while a Wolf School student. See Dec. at 26 ("[T]here is no evidence that the progress was slow at all. It appears from all of the testimony and reports on the record that once [P.J.] began accessing school on a regular basis, the student made steady progress.").

Ms. Granoff, the Wolf director of admissions, dealt directly with the Parent and P.J. beginning in late April 2012 and remained involved; she attended team meetings, monitored P.J.'s progress and met with the Parent to talk about his progress. Vol. XI at 1341. At no time during these interactions did she ever hear a complaint from the Parent that P.J. was not making academic progress at Wolf. Vol. XI at 1341. Ms. Granoff opined that P.J. made progress while a student at the Wolf School. Vol. XI at 1361-62. The hearing officer's findings reflect her

reliance on Ms. Granoff's testimony. Dec. at 24 (referring to opinion of Ms. Granoff that, "in his two years at Wolf, the student progressed well educationally, socially and emotionally").

Ms. Seal, P.J.'s mathematics/science teacher for seventh and eighth grades and home room teacher for eighth grade, attended many of P.J.'s IEP meetings and was responsible for formulating his mathematics goals. Vol. I at 10-41. It was her opinion, expressed at the May 14, 2013, IEP meeting, that P.J. did not need tutoring in mathematics. P-75; see P-238 (during September 24, 2013, IEP meeting, Ms. Seal states that P.J. had made "substantial progress in mathematics area" at Wolf). At the hearing, Ms. Seal described P.J. as a child who "was transformed" at Wolf, as he began to play sports and became comfortable speaking with peers, going to overnights, engaging in the "antics that all 14ish-year-old boys do." Vol. I at 55, 63, 67, 69. Ms. Seal testified that P.J. made progress during his two years at Wolf. Vol. I at 67, 69. The hearing officer relied on Ms. Seal's testimony to support her finding that P.J. "absolutely made a lot of progress at Wolf and that it was an appropriate placement for him."[20] Dec. 8-11.

While not mentioned in the Decision, one aspect of Ms. Seal's testimony is pertinent to the hearing officer's finding that P.J. made steady academic progress at the Wolf School. Ms. Seal explained that P.J. forged such positive relationships with Wolf teachers that he stayed in contact after graduation. She described the contents of a note P.J. wrote to her from the Gow School, in which he thanked his Wolf teachers "for everything while he was at Wolf, and he wrote about how he not only appreciated the academics, but also supporting him in study skills and taking notes and being prepared for tests." Vol. I at 68.

---

[20] Ms. Seal was called as the Parent's witness. Nevertheless, as the hearing officer found, her testimony unambiguously supported the conclusion that P.J. made steady progress and received FAPE at the Wolf School.

The other classroom teacher who testified, Ms. Gagne, participated in some of P.J.'s IEP meetings and was responsible for his IEP goals and objectives for literacy, reading and writing, based on reading tests performed in September and May of each school year.  Vol. X at 1168.  It was her opinion expressed, for example, at the May 14, 2013, IEP meeting that P.J. did not need specialized reading goals, and that he was able to handle the curriculum without difficulty.  Vol. X at 1166-68.  She did find that P.J. had a writing disorder and incorporated appropriate goals into the IEP to address it.  Vol. X at 1192-93.  It was her professional opinion, based not only on her expertise but also on her evaluations and extensive observation of P.J. in the academic setting over his two years at Wolf, that "socially and emotionally he made a lot of progress . . . [a]nd as far as academics, he showed improvement in those areas as well."  Vol. X at 1171.  She opined that P.J. received FAPE while at Wolf.  Vol. X at 1171.  The hearing officer adopted Ms. Gagne's testimony to support her findings that P.J. received appropriate supports and accommodations and made steady academic progress at the Wolf School.  Dec. at 23, 26.

As the Wolf School implemented the 2012/2013 and 2013/2014 IEPs, the District was periodically advised by Wolf that P.J. was making academic progress as his teachers worked on closing the gaps caused by years of prolonged absence.  Vol. IX at 1114-15; see P-238 (at September 24, 2013, IEP meeting, Wolf teachers opine that P.J. making academic progress).  That he made tremendous emotional/social progress while at Wolf is not in dispute.  ECF No. 10-1 at 25; ECF No. 16 at 5.

Before rejecting the Parent's testimony that she believed that her son made trivial academic progress while at Wolf, Vol. X at 1269, the hearing officer pressed her regarding whether, at any time during the two years that P.J. was enrolled at Wolf, she ever asked for another placement or told the District that she believed the placement was not providing FAPE.

Vol. X at 1266.  The Parent tried to avoid answering the question by blaming the District for not

holding enough IEP meetings: "[w]e didn't have the meeting we were supposed to have."  Vol.

X at 1266.  Noting the unusually large number of IEP meetings reflected in the record, the

hearing officer asked the question three more times until the Parent finally answered that she

never asked for another placement.  Vol. X at 1266-67.  The hearing officer relied on this

admission in her Decision.  Dec. at 20.

c. P.J.'s 2013/2014 Education at the Wolf School – Dispute<br>Regarding the Educational Evaluation

In addition to her general criticism of P.J.'s Wolf education, the Parent also specifically

complains about the District's failure to include in the 2013/2014 IEP the array of interventions

recommended in Dr. Andrea Kotula's educational evaluation, as discussed at the September 24,

2013, IEP meeting.  Vol. III at 293; P-238.

At the IEP meeting, Dr. Kotula was critical of the IEP under discussion because her test

results showed significant learning gaps; to fill the gaps, she opined that P.J. required a reading

goal, an organization goal and a more specific mathematics goal with substantial time devoted to

tutoring and remediation.  Vol. III at 293; P-238.  The Wolf teachers present at the meeting (Ms.

Seal and Ms. Gagne) vehemently disagreed with the results of Dr. Kotula's one-time assessment

based on their own longitudinal testing and observation.  P-238 (Ms. Seal stated that P.J. is not

functioning at third grade level in mathematics; Ms. Gagne stated that she does not see reading

slowness described in Kotula report); see Vol. X at 1220-24 (Dr. Osowiecki disagrees with Dr.

Kotula's testing protocols and results).  Both teachers expressed dismay based on their belief that

that P.J.'s anxiety would be adversely impacted if he were forced to switch from the classes he

enjoyed to the intensive tutoring and remediation proposed by Dr. Kotula.  P-238 (Wolf teacher

24

describes P.J.'s achievements as "fragile" and expresses fear that Kotula interventions would "destroy" them).  At the IEP meeting, Dr. Kotula conceded that anxiety is primary in that it affects everything and that labeling P.J. with dyslexia would not be appropriate until it can be determined whether his learning gaps are due only to his school absences.  Dec. at 15; P-238.

After careful consideration of Dr. Kotula's recommendations by the team, the IEP was edited to reflect some, but not all of them.  E.g., Vol. I at 24; Vol. IX at 1083; P-115; P-170-6. Others were already embedded in the Wolf program.  P-238.  Ultimately, where the educators clashed with Dr. Kotula, the District accepted the opinions of the Wolf educators:

> We considered Dr. Kotula's evaluation and we also considered the information of the Wolf School.  Dr. Kotula met with [P.J.] on one or two occasions, where I had people who had been working with him and instructing him and talking about his ability to access FAPE and his performance on a daily basis for a year-and-a-half, so I relied on them and their expertise.

Vol. IX at 1083; see also Vol. IX at 1115 ("Day-to-day tends to demonstrate more than one standardized test in one snapshot of time, especially a student who has high anxiety who doesn't do as well on tests.").

During the September 24, 2013, IEP meeting, the Wolf School and the District repeatedly emphasized that, as a private school, Wolf was limited in the services it could provide, and that, if the Parent believed that Wolf was not able to meet P.J.'s educational needs, the District would propose another placement.[21]  Vol. IX at 987-88; e.g., P-238.  The Parent was clearly advised that, if Dr. Kotula's recommendations accurately reflected P.J.'s true educational needs and needed to be incorporated whole-cloth into his IEP, as the Parent was advocating, Wolf would no

---

[21] During the IEP meeting, P.J.'s Wolf School teachers respectfully and courteously told the Parent that they felt that there had been so many IEP meetings about P.J. and that, at every meeting, nothing ever seemed to be good enough. P-238.  As a result, they had become "uncomfortable."  P-238.  Despite their pleasure in having P.J. as a student, they suggested that, if Wolf could not do what the Parent wanted, maybe she should ask for another placement.  In response, she replied that "Wolf is good" and that she wanted him to stay at Wolf.  P-238.

longer be an appropriate placement for P.J.  He would be moved back to a District school, which could implement them.  Vol. IX at 1027-28.  In response, the Parent insisted that she wanted her son to remain at the Wolf School.  See Dec. at 20; P-238.  Put differently, the Parent wanted Wolf even though she understood that Wolf would continue to implement P.J.'s IEP as drafted, but that Wolf could not, and would not, alter its approach to P.J.'s education by adding the unnecessary and possibly detrimental interventions that Dr. Kotula was recommending.  P-238; see Vol. X at 1266.  As Ms. Eagan explained:

> The parent wanted to continue placement at The Wolf School. . . . she requested a reading goal, and the Wolf School staff did not feel that he required one. . . . I wasn't micromanaging the Wolf School.  The . . . parent seemed to be very happy with The Wolf School.  The student was going to school, he was making progress. The Wolf School said that socially and emotionally he was fitting in in that location.  The Wolf School stated that he was making progress in reading and they didn't have concerns with reading.

Vol. IX at 1113-14.

Based on all of this evidence, the hearing officer found that the plan implemented by the education program at the Wolf School "furnished [P.J.] with identified supports and accommodations as permitted him to access the curriculum and make steady progress throughout his tenure there."  Dec. at 26.  The Decision adverts to the expert testimony, which established that P.J. was proficient in reading, with reading speed slowed by gaps in phonics, decoding and spelling.  The hearing officer found that neither the District nor the Wolf School was required to acquiesce to the Parent's requests that all the Kotula interventions be incorporated in the IEP when "the evidence demonstrated that the child was progressing well."  Dec. at 27.

d.      P.J.'s 2013/2014 Education at the Wolf School –
        Dispute Regarding the Transportation Plan

The Parent claims that the District's failure to provide IDEA-compliant transportation to the Wolf School is another reason why P.J. did not receive FAPE while there.  Consistent with the Settlement Agreement, during the 2012/2013 school year, the Parent drove P.J. to the Wolf School because he refused to ride the school bus.  Although she complained, she did not insist on a different transportation plan.  Vol. IX at 1004-06, 1010; P-38.  However, during the summer of 2013, the Parent emailed Ms. Eagan about an incident when P.J. tried to take the bus home from Wolf's summer program.  P-88.  In response, Ms. Eagan proposed an immediate IEP meeting during the summer to discuss such a plan.  The Parent refused to meet until September.  P-85-9.  In the fall of 2013, working with Wolf School staff, the District developed a proposal for a one-on-one ride in the smallest bus in the statewide school transport fleet, with a trusted driver, to be implemented at first just for the ride home.  Vol. I. at 69-71; Vol. IX at 1008, 1016.  However, the Parent told the District that it could not attempt to implement this plan unless and until Dr. Smith, P.J.'s therapist, approved it.  She then refused to allow the District to communicate with Dr. Smith.  Dec. at 8-9, 11-13; Vol. IX at 1017-20; Vol. XI at 1371, 1395.

During the 2013/2014 IEP meetings, the dispute over transportation dominated the discussion.  Vol. IV at 433-36; P-238.  At the September 24, 2013, IEP meeting, the District's proposal was laid out, and the Wolf therapist told the Parent that, based on her conversation with Dr. Smith, she believed he would consider it to be a good plan.[22]  P-238.  The Parent was not satisfied because she wanted the District to hire an independent certified expert to formulate a Functional Behavioral Assessment, or "FBA," to study P.J.'s aversion to transportation on the school bus and to arrange for a private car or van, despite P.J.'s demonstrable ability to ride the

---

[22] On September 11, 2013, the Parent had signed a limited release allowing Wolf, but not the District, to speak to (but not exchange any documents with) Dr. Smith for a thirty-day period; Dr. Smith and a Wolf therapist had one conversation about transportation concepts before the release lapsed and the communication terminated.  P-99.

school bus during day trips at Wolf.  Vol. IV at 435-38; Vol. IX at 1015, 1019.  The Parent

persistently refused to allow the District to implement its plan without Dr. Smith's approval, and

persistently refused to allow the District to communicate with him.  E.g., Vol. X at 1311; P-238.

At the hearing, Dr. Smith testified he was not aware that the District had developed a

transportation plan that called for one-on-one transportation, direct, with no stops.  Vol. II at

177-78.  He stated that it sounded like what he had "proposed . . . to the school" in his September

2013 conversation with the Wolf therapist.  Vol. II at 178, 180.  He also testified that he had

never advised anyone that such a plan should not be implemented; rather, his advice was simply

that P.J. should not be forced into any transportation arrangement.  Vol. II at 178-79.

Based on this evidence, the hearing officer made the well-supported finding that the

District's appropriate offer of specialized transportation was refused by the Parent.

### iv.  Educational Disputes Regarding the Transition to High School – the 2014/2015 IEP, ASA and the Gow School

The second core matter in this due process proceeding is the appropriateness of the

District's plan for P.J.'s transition to ninth grade and high school.  The topic of high school was

tentatively introduced in the spring of 2013, at the same time that the District was working on the

eighth grade IEP.  Vol. IX at 981-84;Vol. III at 300, 304-05.  Over the course of the 2013/2014

school year, the District convened six IEP meetings to discuss the transition to high school;

beginning in December 2013, the District began work on it in earnest.[23]  E.g., P-137; P-238; P-

239.  At the December 17, 2013, IEP meeting, the District proposed placement at ASA, but also

---

[23] The Court was struck by the Parent's vituperative accusation, which can be heard on the recording of the June 30, 2014, IEP meeting, that the District is at fault for not introducing the topic of high school placement until the last day of June 2014.  P-241.  In fact, it was mentioned far earlier and the District began actively focusing on it at the December 17, 2013, IEP meeting.  P-238.

began consideration of other alternatives, particularly School One,[24] and continued to refine the draft IEP as new information was collected.  Vol. XI at 1371-72; P-238.  The Parent suggested Middlebridge; the District objected because it would be unable to provide P.J. with the therapeutic supports required by his IEP.[25]  P-238.

On behalf of the District, Ms. Eagan described why she had formed the professional opinion that ASA, with its "special class integrated" program, would be an appropriate placement.  Vol. XI at 1373.  She explained that it was developed by the District to provide an educational alternative to allow students, such as those with anxiety, to learn at their own pace. It is housed in a newly-rehabilitated building very close and readily accessible to the high school and provides education services in a small structured setting, staffed with regular and special education staff with the expertise to work with P.J. on closing educational gaps, and with therapists ("OT and speech and language") and a school psychologist to provide therapeutic support.  Vol. XI at 1373; P-238.  ASA's teachers are trained to work with students like P.J. who have Asperger's syndrome, executive functioning deficits and severe anxiety, and are trained to teach using the systemic language program recommended for P.J. by Dr. Kotula.  Vol. XI at 1421-22.  Further, if he were emotionally and academically able to do so, P.J. could move from

---

[24] School One is a private school that was recommended for P.J. by the Wolf School staff.  Vol. I at 46; Vol. XI at 1371.  After P.J. and the Parent visited it, they rejected it for a host of reasons.  Vol. VIII at 863-78.  Based on the hearing officer's well-supported finding that ASA was an appropriate placement, this report and recommendation does not focus on the School One alternative, which the District continued to consider appropriate.

[25] There is no other evidence in the record about the appropriateness of Middlebridge, except for the educational advocate's testimony that Middlebridge should have been deemed an appropriate placement because the District paid for another unknown child to attend.  Cross examination revealed that she based this testimony on a document acquired from a FOIA request purportedly showing that the District had paid $40,000 to Middlebridge for an unspecified purpose, which the advocate speculated must be tuition for a student.  Vol. IV at 478-81.  The hearing officer properly declined to consider this testimony.  Dec. at 16.

structured ASA classes to the least restrictive environment[26] of the general education classes and extracurricular activities at the high school.  Vol. XI at 1373, 1430-31.

Ms. Eagan also provided detailed testimony about the process of formulating the 2014/2015 IEP, the final version of which is dated July 15, 2014 (P-206).  Vol. IX at 1115-27; Vol. XI at 1375-78.  Based on the Wolf School reports and Dr. Kotula's evaluation, among other input, the team concluded that P.J.'s reading deficits did not require special education, but could be addressed by a reading specialist and personal literacy plan focused on the gaps, including decoding and phonological awareness; the 2014/2015 IEP, as implemented at ASA, addressed these needs.  Vol. XI at 1374-75.  For mathematics, the 2014/2015 IEP was based on a gap analysis, the expert reports and input from the Wolf School.  Vol. XI at 1376.  When the transition information and the neuropsychological evaluation were received, the team added executive functioning goals and psychological services.  Vol. IX at 1108, 1112.  Based on the recommendation of the Wolf School, the IEP included ESY.[27]  The differences in the time allotted to certain classes from the 2013/2014 IEP to the 2014/2015 IEP reflected the difference between a middle school schedule and a high school schedule.  Vol. IX at 1107.

To assist with P.J.'s post-Wolf placement decision, one of his Wolf School teachers, Ms. Seal, toured ASA and found it to be impressive.  Vol. I at 49-54.  She observed students working on computer skills and algebra, similar to what P.J. would be doing, and thought it was a "great

---

[26]  The preference for education in the "least restrictive environment" is embodied in IDEA: "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled."  20 U.S.C. § 1412(a)(5)(A).

[27]  Ms. Eagan arranged for P.J. to receive summer services from certified special education teachers.  However, the Parent refused to allow him to go.  Vol. XI at 1377-78.  When the ESY teachers contacted the Parent, she quizzed them about their credentials but then never called back.  Vol. XI at 1446.  By that time, P.J. had been accepted at the Gow School.  P-201-4; see Dec. at 29 (finding that, while District still trying to work with Parent, she was already committed to Gow).  The hearing officer noted that the Parent had wanted the ESY to be done at Wolf, which was no longer possible.  Dec. at 20.

combination . . . a good quality program."  Vol. I at 49-50.  In the reading area, she saw small

groups working and a student reading and found that area "another great looking thing."  Vol. I

at 50.  "I was impressed by just the amount of support these kids were getting."  Vol. I at 51.  At

the Parent's request, Ms. Seal created a list of the Wolf accommodations that she believed P.J.

would need in high school, all of which would be available to him at ASA.[28]  P-186.  The Seal

testimony establishes that the ASA "program was similar to that offered to the student at The

Wolf School."[29]  Dec. at 10.

Dr. Smith, P.J.'s therapist, likewise assisted with P.J.'s high school decision by visiting

ASA on P.J.'s behalf.  Vol. II at 136.  He found it to be "a very lovely building . . . well lit, . . . a

nice space."  Vol. II at 138.  When the Parent's attorney asked him whether he thought P.J. could

do well in its space, he said, "[s]o much depends on more than the space," questioning only

whether P.J. would be emotionally able to take advantage of the proximity of the high school.

Vol. II at 139, 145.  Dr. Smith opined that the other high school placements suggested by the

District (School One and the Providence Center) would not be appropriate, but never said that

ASA would not be appropriate.  Instead, he reiterated his very positive impression of ASA in an

email he wrote to Ms. Eagan on July 3, 2014, confirming that the other proposed placements

would not be appropriate, but expressing only admiration for ASA.  P-208-1 ("Providing a first

---

[28] While Ms. Seal did not know whether these accommodations would be available to P.J. at ASA, Ms. Eagan testified that they either are embedded in P.J.'s 2014/2015 IEP or are incorporated into the ASA program.  Vol. IX at 1127 ("we added [to 2014/2015 IEP] many of the accommodations that they [Wolf] felt that they put right into their . . . program"); Vol. XI at 1376-77 (all of accommodations listed by Wolf were considered by District, many were incorporated into P.J.'s IEP, others were part of standard classroom practice, all of which was explained to Parent by letter).

[29] As already observed, Ms. Seal was called as the Parent's witness to establish her stay-put right to placement at the Gow School.  Instead, Ms. Seal's uncontroverted testimony establishes that ASA would be an appropriate continuation of the educational services P.J. received at the Wolf School.  Dec. at 10.

class environment for children with special needs is so very important and the restoration and redesign of the Hazard Building is most impressive.").

A tour of ASA was also arranged by the District for the Parent and her educational advocate on March 26, 2014.  P-161.  They were asked to sign a confidentiality agreement routinely required by public schools to protect "the confidentiality and privacy rights of . . . other children in the District."  P-166 ("Confidentiality Agreement"); <u>see</u> Dec. at 17 n.*.  After the tour, both opined that ASA was inappropriate for P.J. but refused to say why because she claimed she was prohibited from speaking about it by the Confidentiality Agreement.  At IEP meetings, during the due process hearing and in argument to this Court, they have persisted, saying only that ASA is new and that P.J. will not set foot in any location in South Kingstown, but otherwise refusing to explain why they consider it inappropriate.  P-169-2; <u>e.g.</u>, P-239.  The Parent has also identified the Confidentiality Agreement as one of the actions taken by the District to deny her the right to participate in educational planning for her son, by gagging her from speaking about ASA.  Vol. VIII at 904; P-239; ECF No. 10-1 at 40 n.17.  The educational advocate testified that they refused to give input because the Confidentiality Agreement made her "afraid we would go to jail."[30]  Vol. IV at 462.

The hearing officer was flabbergasted by this testimony:

I'm incredulous that a person who is in this business would think that they were going to a school to be part of a discussion as to whether the client should go to the school and then they go to the meeting, the confidential meeting about their own client and were afraid under threat of jail or perjury, or some kind of criminal aspect, that they would not bring up what they saw at the Success Academy.

---

[30] The evidence establishes that, as soon as Parent raised the Confidentiality Agreement as the reason for her refusal to provide input regarding ASA, the District assured her that it meant no more than what it plainly said – that it protects only the confidentiality of other children, who may be observed during a tour of the program.  Vol. VIII at 905-07.  The recording of the April 22, 2014, IEP meeting confirms that the Parent doggedly held to her refusal to speak about ASA and persisted in her accusation that the Confidentiality Agreement denied her the right to participate.  P-239.

Vol. IV at 464-65.  Ultimately, she found that the refusal to testify about ASA based on the Confidentiality Agreement reflected adversely on the credibility of both the Parent and her educational advocate: "I do not find it credible that the mom and the [educational advocate] signed confidentiality agreements that they thought prevented them from bringing forth information at an IEP meeting discussing [P.J.]."  Vol. VI at 674.  The hearing officer also rejected the proposition that the Confidentiality Agreement affected the Parent's right to participate in her son's educational planning.  These well-founded adverse credibility determinations defenestrate the Parent's attempt to blame the District for her failure to present reasons why ASA was not appropriate for P.J.; they leave her adverse opinion entirely unexplained.  Dec. at 17; see Dec. at 29 ("There is no evidence of any kind on the record that the ASA was not an appropriate placement.").

During the same period in the spring of 2014, the Parent began to look at the Gow School.  P-287 ¶ 12.  At the Parent's request, Ms. Eagan spoke to a Gow admissions officer and learned that Gow is not a special education school and has no occupational or speech and language therapist.  Vol. XI at 1378-79.  Based on its inability to address P.J.'s therapeutic needs, Ms. Eagan concluded it would not be appropriate.  Vol. XI at 1378-79.  The Gow School accepted P.J. on June 24, 2014.  P-201-4.  With the acceptance in hand, on August 1, 2014, the Parent initiated this due process proceeding.  On August 18, 2014, she provided the District with the ten-day-notice of her intent to place P.J. at the Gow School.  P-223.  She claims that she did not decide to place P.J. at Gow until she received its financial aid offer on August 18, 2014, the same day she notified the District.  P-222; P-223; Vol. VIII at 889-90.  The hearing officer found

that she had actually made her decision earlier, while the District was still trying to work with her to resolve placement.[31]  Dec. at 29.

Mr. Cotter, the Gow School director of admissions, testified that none of Gow's teachers are certified in special education, although many are "[r]eading specialists" because the program is designed for children with dyslexia and language-based learning disabilities.  Vol. VII at 707-09, 725-26.  When asked about autism, a disorder Gow has no expertise to address, Mr. Cotter stated that he thought P.J. had "had a diagnosis of Asperger's in the past."  Vol. VII at 709.  Rather, Gow concluded that P.J. had a "severe reading disability"; Mr. Cotter was unable to explain how this meshed with Gow's test results, on which P.J. scored in the average range for reading and written language.  Vol. VII at 716-19; P-226.  In reliance on the evidence, the hearing officer found Gow to be "an elite private school."  Dec. at 30.  Since September 2014, P.J. has been a Gow student, doing well, living on campus, navigating among its buildings, participating in athletics and trips and getting good grades in high school courses such as algebra, theater and global history.  P-225; P-287 ¶¶ 17, 23; Vol. VII at 705-06.

Based on all of this evidence, the hearing officer found that the 2014/2015 IEP "furnished the student with an IEP that provided the special instruction designed to meet the student's needs, complete with supportive assistance and accommodations."  Dec. at 29.  She further found appropriate the District's plan "to address all of those things [the student's primary diagnosis of "emotionally disordered," as well as other identified hindrances to his education (mild autism and ADHD)] at the Academic Success Academy within the district, . . . [which] is the least restrictive environment for this student."  Id.  She also found that the Gow School would not be

---

[31] The Decision refers to "a contract" executed while the District was still working with the Parent.  Dec. at 29.  This appears to be an error in that no such contract was found in the record.  However, the hearing officer's conclusion that the Parent had already decided to send P.J. to Gow, for example, as of the June 30, 2014, IEP meeting, is amply supported by the evidence.  See P-241.

appropriate in light of its lack of special education services and its inability to "meet the requirements of the least restrictive environment" because it is five hundred miles away, thereby precluding any interaction with normally developing peers in South Kingstown.  Dec. 29-30. Finally, she found that the District's 2014/2015 IEP, implemented at ASA, and not the Gow School, would provide an appropriate stay-put while this matter is pending.  Dec. at 30.

### D.    What's Next?

After she initiated this due process proceeding on August 1, 2014, on September 12, 2014, the Parent demanded that the District attend an IEP meeting in Buffalo, New York, to formulate an IEP for the provision of special educational services while P.J. is at the Gow School; the District declined the same day.  P-227; P-281.  On September 15, 2014, the Parent filed a RIDE complaint pursuant to R.I. Gen. Laws § 16-24-1 demanding an IEP meeting; this time the District agreed as long as the meeting was in Rhode Island.  The RIDE complaint was withdrawn without prejudice and IEP meetings were held in October 2014[32] and January 2015. See Vol. IX at 1134.  During the hearing, the hearing officer was told that educational services were not being provided to P.J. by the District while he is at student at the Gow School because, "[w]e are in due process over this IEP right now."  Vol. IX at 1135.

The Parent never asked the hearing officer to resolve this issue.  Instead, she repeatedly confirmed that the issues for decision were limited to those that the hearing officer subsequently decided, which do not include P.J.'s entitlement to services paid for by the District while at Gow. Nevertheless, the Parent asks this Court to resolve it now.

### E.    What the Experts Said

---

[32] There is a recording of the October 2014 IEP meeting on one of two unmarked CDs that were found in the box that transmitted the record to this Court.  This recording confirms that the October 2014 IEP meeting ended inconclusively with the commitment by Gow to provide information and by the District to consider it.

The hearing officer heard testimony from four experts, one of whom, the therapist, was also a percipient witness.  I focus next on this evidence.

### i.      The Therapist

Dr. Duncan Smith, the clinical social worker, provided weekly therapy beginning soon after P.J. started at the Wolf School, continuing until he left Rhode Island to attend the Gow School.  Vol. II at 90, 95.  When he began treating P.J., Dr. Smith understood that "[h]e came with a diagnosis of . . . Asperger's disorder," a mild form of autism, which may manifest itself as a low tolerance for frustration, anxiety, poor social skills, social hesitancy and uneasiness.  Vol. II at 90-91, 94.  Although P.J. is cognitively normal, when he feels threatened or frustrated, he regresses, resulting in behaviors like school refusal, withdrawal from interaction and the inability to restrain the impulse to flee or avoid.  Vol. II at 95-97.  In Dr. Smith's opinion, this impairment has caused P.J. to avoid school and therefore affected his education.  Dr. Smith opined that an educational plan to address P.J.'s needs should not overload him; for example, P.J. should not be pressured with too much after-school tutoring.  Vol. II at 99-104, 120; P-112.  For example, educational strategies that would trigger anxiety should be avoided.  Vol. II at 107, 120.  The hearing officer endorsed these opinions.  Dec. at 11.

Based on his observations in therapy sessions, Dr. Smith opined that P.J.'s "academic performance [at Wolf] struck me as increasingly good, that as the symptoms were subsiding of a condition that he was diagnosed with, then Asperger's, he was able to do more of the intellectual academic work than he had been previous to this time."  Vol. II at 110; Dec. at 12.  As to symptoms impeding education, Dr. Smith testified that P.J. "was finding [Wolf School] more comfortable than other school atmospheres in which he had been, he felt that he was given more time, and that the pressure on him was less than he had before, the social pressure on him, that he

experienced periods of great anxiety, but not as much as he did in other environments." Vol. II at 110. In Dr. Smith's opinion, "[P.J.] should stay at Wolf." P-112; see Vol. II at 115, 180. The hearing officer noted these opinions, but limited her reliance on them because Dr. Smith had not reviewed school records and had not talked to school staff. Dec. at 11-12.

Dr. Smith attended the June 30, 2014, IEP meeting – he remembered it as lasting over two hours, being combative and that "everybody had an opinion about what needed to be done for [P.J.]." Vol. II at 147, 149, 153-54; see P-241. He noted that the team was overly focused on anxiety instead of autism, but provided no opinion regarding how a shift in focus might affect P.J.'s IEP. His own treatment plan for P.J. was focused on anxiety. See Vol. II at 155, 174-76. Nevertheless, he opined that a school specializing in autism would be "preferable." Vol. II at 173; Dec. at 12. As the hearing officer found, Dr. Smith appears to have mistakenly understood that the Gow School specializes in autism and expressed concern that P.J. would not succeed if it did not. Vol. II at 182-83; Dec. at 13. The hearing officer found Dr. Smith's opinion that a school dedicated to autism would be preferable not relevant to FAPE and contrary to IDEA's goal of placement in the least restrictive setting. Dec. at 27.

### ii.     The Educational and Psychological Experts

Dr. Andrea Kotula's educational evaluation took place after the second due process proceeding, at which the hearing officer ruled that an independent educational evaluation was required because the first test was aborted when P.J. became too anxious to continue. Vol. III at 251. Dr. Kotula's only interaction with P.J. was one day of testing on August 9, 2013, just before eighth grade. P-94. She found that P.J. was comprehending written text at an eighth grade level but reading very slowly because of anxiety, weak phoneme awareness, below average sight vocabulary and poor spelling, with oral reading at the sixth grade level. P-94-9-10.

37

In mathematics, she found that P.J. was functioning on a third grade level, with poor mastery of mathematics facts and the inability to perform higher level mathematical procedures.  P-94-10. Noting the many school absences, Dr. Kotula did not diagnose any learning disability, including dyslexia, even though she believed that P.J.'s profile suggested such a diagnosis; instead, she concluded that P.J. had many gaps from failing to attend school.  Vol. III at 278; P-94-10.  Based on these findings, she recommended placement in a special education day school (like Wolf) with small classes and individualized instruction, but with intensive daily tutoring in phonetics, decoding, encoding, vocabulary, reading fluency, and writing and individual or small group teaching of mathematics computation, organizational and study skills, with tutoring during vacations and summer.  P-94-10-15.  She was critical of the lack of reading goals in the 2013/2014 and 2014/2015 IEPs.  Vol. III at 271, 293-96.

Dr. Brett Leimkuhler's neuropsychological report was based on a two-day evaluation completed in December 2013, when P.J. was in eighth grade.  Vol. III at 192-97; P-127.  In his report, Dr. Leimkuhler noted that, since attending the Wolf School, P.J.'s school refusal had ended, he had school friends, participated in sports and extracurricular activities, enjoyed school and looked forward to returning for the first time.  P-127-1.  Based on information provided by the Parent, the report references P.J.'s "severe anxiety as a child," "intense fear of the school bus" and meltdowns at home so severe that "[t]he question of Bipolar Spectrum Disorder has been raised."  P-127-1-2.  With scores reflecting average or high average intellectual ability that probably underestimate P.J.'s real cognitive capacity, Dr. Leimkuhler diagnosed Asperger's spectrum disorder, anxiety disorder, attention deficit disorder, depressive disorder, mood disorder, reading disorder/dyslexia, disorder of written expression, learning disorder, NOS, and developmental coordination disorder.  P-127-4.  While endorsing the diagnosis of Asperger's, he

38

noted that the "clinical presentation is consistent with Anxiety Disorder with features of social anxiety and depression."  P-127-6; Vol. III at 236.

By contrast with Dr. Kotula, who is an educational expert, yet did not diagnosis dyslexia, Dr. Leimkuhler considered P.J.'s weaknesses in decoding and spelling to be consistent with dyslexia.  Vol. III at 217; but see P-127-4 (finding dyslexia despite test results showing silent reading "superior" and oral reading "average"); P-239 (District questions Leimkuhler dyslexia diagnosis because contradicted by test results showing reading at above high school level).  In mathematics, Dr. Leimkuhler found measurable progress at the Wolf School since Dr. Kotula's testing.  P-127-5.  Overall, Dr. Leimkuhler's impression of P.J.'s Wolf education was positive: "[P.J.] started at the Wolf School in seventh grade and has been doing well."  P-127-2.  He found that P.J.'s success at Wolf was due not only to the environment, "which enables him to overcome his anxiety about going to school," but also to Wolf's "academic curriculum and programming." P-127-6.  While the report notes that "his mother remains concerned about academic progress," it does not reflect that Dr. Leimkuhler shared her concerns.  P-127-2.

For the future, Dr. Leimkuhler recommended tutoring in writing, remedial reading and continued support in mathematics and other accommodations, many of which P.J. was already receiving.  P-127-7-8.  For high school, he suggested an integrated program able to provide services to meet P.J.'s educational, emotional and social needs; an appropriate school should be able to address dyslexia, executive function deficits, emotional issues and social/interpersonal needs.  P-127-9; Vol. III at 226-28.  Dr. Leimkuhler disagreed with Dr. Smith over placement; he opined that P.J. should not be isolated in a school that specializes in autism.  Vol. III at 229-31; see Vol. III at 230 ("if we put him in classes that are designed for children who have less ability than he has, then we're depriving him the education he is capable of achieving").

39

The last of the expert witnesses was the District's consulting neuropsychologist, Dr. Dana Osowiecki,[33] who based her opinions on her review of the records, including the Leimkuhler and Kotula evaluations and the Smith testimony, as well as on her observations of the ASA program. Vol. X at 1213.  Dr. Osowiecki disagreed with Dr. Smith's opinion that P.J.'s education plan should be focused on autism; rather, she found that "anxiety was a very disabling condition for [P.J.] and that that was more disabling than his autism symptoms . . . because it prevents him from being able to access different opportunities, like transportation to school."  Vol. X. at 1214, 1219; see Vol. X at 1258 ("I think that [P.J.]'s anxiety is very debilitating.").  A placement based exclusively on autism would be particularly inappropriate because P.J. "performs well in the school environment in terms of peer relationships, his behavior at school and his relatedness to his peers and adults."  Vol. X at 1215.  With respect to treatment of anxiety, she opined (as did Dr. Leimkuhler) that cognitive behavioral therapy would be preferable to the "talk" therapy that Dr. Smith used, as well as that severe avoidance due to anxiety can cause children to become more and more fearful and should be promptly addressed.  Vol. X at 1219, 1228.

Dr. Osowiecki criticized some of Dr. Kotula's testing protocols, agreed with her conclusion that P.J. does not have dyslexia, but disagreed with the recommendation for reading goals in the IEP.  Vol. X at 1222.  Dr. Osowiecki opined that P.J.'s good reading comprehension would allow him to access his education, and that nothing in any of the test results she reviewed

---

[33] The Parent argued that Dr. Osowiecki should not be allowed to testify because she had access to P.J.'s records but had not signed a consent form in violation of P.J.'s privacy rights pursuant to the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA").  The hearing officer properly rejected this objection.  As a consultant engaged by the District to assist with special education planning for specific students, including P.J., Dr. Osowiecki clearly is a "school official[] . . . who ha[s] been determined by such [local educational] agency to have legitimate educational interests . . . ."  20 U.S.C. § 1232g(b)(1)(A).  The Parent's related argument that the District's education interest in P.J. lapsed when he was placed at Gow is contradicted by the fact that there have been ongoing IEP meetings in late 2014 and into 2015.  The hearing officer also properly rejected the Parent's argument that Dr. Osowiecki should not be allowed to testify because she did not evaluate or observe P.J.  See Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm., 361 F.3d 80, 85-86 (1st Cir. 2004) (district court reasonably relied on testimony from well-qualified expert who did not meet with child).

was indicative of the need for special education in reading.  Vol. X at 1223.  She found that Dr.

Leimhuhler's test results did not support his diagnoses of dyslexia and learning disability; more

importantly, the reading interventions proposed by Dr. Leimkuhler were remedial, did not

require special education and could be delivered by a general education specialist.  Vol. X at

1223; see Vol. X at 1229 ("I did not feel there was evidence to diagnose dyslexia.").  She agreed

that P.J. had issues with executive functioning, fine motor skills, spelling and reading fluency,

but could not confirm the diagnosis of autism without meeting P.J.  Vol. X at 1225-27, 1229-30.

Based on her observation of ASA, Dr. Osowiecki opined that its program would provide

P.J. with the specialized setting that he needed to be educated with typical peers in small classes

and "quite a bit of teacher support"; she opined that P.J. would receive FAPE at ASA.  Vol. X at

1231.  If anxiety became severe and interfered with such a placement, she recommended prompt

treatment, with which she could assist.  Vol. X at 1232.  Based on her review of the many

evaluations and assessments already available, Dr. Osowiekci opined that no additional

evaluations or assessments were needed to formulate an educational plan – "I think he has had

many evaluations.  It's more in the interpretation of the data.  I don't know that gathering,

putting him through more testing is necessary."  Vol. X at 1244.  As to the Gow School, Dr.

Osowiecki testified, "I'm not sure why he is at a school for children with dyslexia when it seems

like many other needs are identified for him."  Vol. X at 1254.

The hearing officer considered these opinions carefully and largely accepted them.  She

resolved the inconsistency between Dr. Kotula's recommendations and the opinions of Dr.

Osowiecki and Dr. Leimkuhler that remediation was needed based on her finding that "the child

was progressing well," as well as on her conclusion that Dr. Kotula's proposal for "1-1 reading

instruction" would remove P.J. from "the least restrictive environment for learning."  Dec. at 27.

41

F.   **The Educational Advocate**

Apart from the Parent herself, the Parent's case was principally buttressed by the controversial testimony of Crescentia Brodeur, the educational advocate she hired in May 2013. Vol. III at 304.  Ms. Brodeur attended IEP meetings with the Parent, including all of the recorded sessions, and the Parent paid her generously for her services; in all, she received over $10,000. Vol. VII at 728-30 ($500 retainer, $500 for each IEP meeting attended and hourly for other work); Vol. III at 304; Vol. IV at 370; P-238; P-239; P-240; P-241.  After reviewing Ms. Brodeur's professional qualifications (a B.S. degree in rehabilitation psychology and work as an educational advocate), the hearing officer ruled that she would accept Ms. Brodeur's as a lay witness regarding her personal knowledge of events, would not qualify her to testify as an expert. Vol. III at 303; Dec. at 18 ("She is not certified as a teacher, psychologist or therapist.  She has not undertaken any course work in IEPs, FAPE or transition programming for students."); Vol. IV at 374 ("I don't think she qualifies as an expert.").  During the three days that she testified, the hearing officer repeatedly found that her testimony lacked credibility or an appropriate foundation, sustained objections to improper leading questions asked by her professional colleague, the Parent's attorney, and admonished her colleague for interfering in the District's cross examination.  E.g., Vol. IV at 464 ("I'm incredulous"); Vol. V at 605 ("You're practically giving her the answer."); Vol. VI at 674 ("I do not find it credible"); Vol. VII at 745 ("you can examine the witness after [the District's attorney] is done").  In all, her testimony consumed twenty-five percent of the hearing.  Vol. III at 302 – Vol. VI at 679.

Ms. Brodeur is the only witness who opined that the Wolf School did not afford P.J. FAPE.  Vol. IV at 396-97.  Other than the Parent, she is the only witness who opined that P.J. made trivial progress while at the Wolf School.  Vol. V at 512-13.  Other than the Parent, she is

the only witness who opined that the District failed to offer an appropriate transportation plan; she testified that Dr. Smith prevented the implementation of the District's transportation plan, which Dr. Smith himself denied.  Vol. IV at 435-37; Vol. VII at 773-74.  Other than the Parent, she is the only witness who testified that the 2014/2015 IEP was completely unacceptable and that ASA would be inappropriate.  Vol. V at 586-600; Vol. VI at 667-72.  Other than the Parent, she is the only witness who opined that the Parent's input regarding the education of her child was not considered by the IEP team.  Vol. VI at 685.  And other than the Parent, she was the only witness who opined that the Gow School was an appropriate placement.  Vol. VI at 667-72.

    In her brief, the Parent argues that Ms. Brodeur "gave comprehensive, intelligent and corroborated testimony that was based on the facts of this case as well as her personal experience as an advocate."  ECF No. 10-1 at 53.  Although the testimony certainly was comprehensive, my independent review of it, particularly by comparison with the recordings of the IEP meetings in which she participated, does not permit the finding that it was either intelligent or corroborated; rather, it seems to be conclusory, self-serving and frequently lacking in credibility.  Thus, I find well founded the hearing officer's conclusion that the education advocate established little more than that the Parent "complained continuously about evaluations," and that transportation was brought up at every meeting that she attended.  Dec. 15-16.  Otherwise, the hearing officer properly rejected her opinions because of her lack of expertise and first-hand knowledge; she specifically rejected the opinion that P.J. did not receive FAPE from either the Wolf School or the District.  Dec. at 18 ("[Brodeur] concluded that it was her opinion that the student did not receive FAPE from the district or at The Wolf School"); Dec. at 26 ("no credible evidence on the record to support a finding that the district did not provide the student with FAPE during his Wolf years").  The hearing officer's treatment of Ms. Brodeur's testimony is firmly grounded in

her observations of her demeanor and credibility and is amply supported by the record; as such, the hearing officer's rejection of it is entitled to this Court's full deference.

## III.    STANDARD OF REVIEW

"Congress designed the IDEA as part of an effort to help states provide educational services to disabled children."  D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 34 (1st Cir. 2012) (quoting C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 284 (1st Cir. 2008)); Coventry Pub. Sch. v. Rachel J., 893 F. Supp. 2d 322, 332 (D.R.I. 2012).  An essential element of IDEA's framework is that the state must permit parents or school districts to bring a complaint about "any matter relating to" those educational services for resolution at "an impartial due process hearing."  20 U.S.C. § 1415(b)(1-2); see Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 182-83 (1982).  Thereafter, "[a]ny party aggrieved by the findings and decision" of the state administrative hearing has "the right to bring a civil action with respect to the complaint . . . in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy."  20 U.S.C. § 1415(i)(2)(A).  In federal court, the administratively-exhausted issues are generally framed for decision on dueling motions for summary judgment.  Unlike a traditional summary judgment motion, an IDEA motion for summary judgment does not limit the court to considering the facts in the light most favorable to the non-moving party; rather, it "is a procedural device through which to decide the case on the basis of the administrative record."  Linda E. v. Bristol Warren Reg'l Sch. Dist., 758 F. Supp. 2d 75, 87 (D.R.I. 2010) (quoting Cranston Sch. Dist. v. Q.D., C.A. No. 06–538ML, 2008 WL 4145980, at *5 (D.R.I. Sept. 8, 2008)).

IDEA requires the court to impose the burden of proof on the party challenging the outcome of the administrative decision, here the Parent.  See Schaffer v. Weast, 546 U.S. 49, 62

(2005); Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 54 (1st Cir. 1992); Linda E., 758 F.

Supp. 2d at 87.  This remains true when the parent seeks to establish the district's responsibility

for the costs of the student's out-of-district placement, as long as it is the parent who is the party

seeking relief.  Coventry Pub. Sch., 893 F. Supp. 2d at 329.  Nevertheless, it is also a bedrock

IDEA principle that the school district always bears the burden in the due process hearing of

showing that its proposed IEP is adequate.  See Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm.,

361 F.3d 80, 82 n.1 (1st Cir. 2004).

      In an IDEA "appeal,"[34] the court's decision is based on the administrative record, which

may be supplemented by additional evidence from the parties; the court should afford due

deference to the hearing officer's findings of fact and *de novo* review to the rulings of law.  Lt.

T.B. ex rel. N.B., 361 F.3d at 83.  Judicial review of IDEA administrative decisions is less

deferential than the review appropriate for other administrative rulings.  While IDEA requires

due deference to the hearing officer's findings of fact, ultimately, the reviewing court must make

an independent decision based on the preponderance of the evidence.  Kathleen H. v. Mass.

Dep't of Educ., 154 F.3d 8, 13 (1st Cir. 1998) (citing Roland M. v. Concord Sch. Comm., 910

F.2d 983, 989 (1st Cir. 1990)); see Linda E., 758 F. Supp. 2d at 86-87 (federal court's review is

appropriately "thorough yet deferential").  The court must not accord excessive deference to the

hearing officer's determinations, Doe v. Cape Elizabeth Sch. Dist., 832 F.3d 69, 84 (1st Cir.

2016), nor should it "substitute [its] own notions of sound educational policy for those of the

school authorities which [it] review[s]."  Rowley, 458 U.S. at 206.  Thus, the judicial task is to

engage in "involved oversight" by making a decision that is bounded by the administrative

---

[34] In Doe v. Cape Elizabeth School District, the Circuit rejected the argument that the district court's references to an "appeal" suggests analytical confusion as long as the court engages in the "more critical appraisal" required in an IDEA civil action.  832 F.3d at 82 (quoting Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993)).

record (and additional evidence if any is offered), and is independent by virtue of being based on a preponderance of the evidence before the court.  Cape Elizabeth Sch. Dist., 832 F.3d at 83; Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086-87 (1st Cir. 1993).  It is "an intermediate standard of review . . . [that] falls well short of complete *de novo* review."  Id.  "[T]he persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale." Id.

The appropriate degree of deference depends on the facts, circumstances and legal issues presented by the case.  See Lessard v. Wilton-Lindeborough Coop. Sch. Dist., 518 F.3d 18, 24 (1st Cir. 2008).  For example, "the district court should afford more deference when its review is based entirely on the same evidence as that before the [hearing officer]."  Cape Elizabeth Sch. Dist., 832 F.3d at 84.  The court also should afford deference to findings that credit local educators over the testimony of outside experts.  See Sebastian M. v. King Philip Reg'l Sch. Dist., 685 F.3d 79, 86 (1st Cir. 2012) (proper to credit testimony of educators over outside experts who spent little time with child); Hartmann v. Loudoun Cty. Bd. of Educ., 118 F.3d 996, 1003-05 (4th Cir. 1997), cert. denied, 522 U.S. 1046 (1998) (local educators deserve latitude in determining most appropriate individualized education program).  Similarly, the hearing officer's resolution of inconsistencies in the testimony of dueling experts is a first-instance administrative determination that is entitled to judicial deference.  Sebastian M., 685 F.3d at 86.

The hearing officer's credibility determinations are entitled to particular deference.  Doe ex rel. Doe v. Attleboro Pub. Sch., 960 F. Supp. 2d 286, 294-95 (D. Mass. 2013); Sudbury Pub. Sch. v. Mass. Dep't of Elementary & Secondary Educ., 762 F. Supp. 2d 254, 262 (D. Mass. 2010) (relying on hearing officer's credibility assessment as supported by the record where "[c]redibility determinations are the province of the factfinder, in this case the Hearing Officer");

N. Reading Sch. Comm. v. Bureau of Spec. Educ. Appeals of Mass. Dep't of Educ., 480 F. Supp.
2d 479, 490 (D. Mass. 2007) (upholding hearing officer's conclusion because "[g]iven that this is
a fact-intensive inquiry that relies on credibility determinations (which the hearing officer, with
both expertise and contemporaneous perspective, is in a better position than I to make), there is
no reason to disturb the hearing officer's conclusion").  As long as the hearing officer did not
base her credibility determinations on improper considerations, there is no error and the court
should defer.  Johnson v. Boston Pub. Sch., No. 1:15-CV-10026-ADB, 2016 WL 4408986, at
*12 (D. Mass. Aug. 17, 2016).

    At bottom, the degree of deference the court should afford to the hearing officer depends
on the persuasiveness of the administrative findings, for example, whether the decision under
review is well-reasoned and whether it was based on the hearing officer's substantially greater
familiarity with the evidence and the witnesses.  Cape Elizabeth Sch. Dist., 832 F.3d at 84 (citing
M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012)).  Such deference recognizes
that judges are not "trained pedagogues," and therefore the court must "accord deference to the
state agency's application of its specialized knowledge."  Lessard, 518 F.3d at 24; Roland M.,
910 F.2d at 989 ("Jurists are not trained, practicing educators.").

    After the court has performed a thorough yet deferential review, it is free to accept or
reject the hearing officer's findings in whole or in part.  Town of Burlington v. Dep't of Educ.,
736 F.2d 773, 792 (1st Cir. 1984).  If the hearing officer's decision is not supported by the
evidence in the record, it must be reversed.  Millay ex rel. YRM v. Surry Sch. Dep't, 707 F.
Supp. 2d 56, 64 (D. Me. 2010) (hearing officer reversed when "decision is not supported by the
evidence in this record or by his stated findings"); see also Carlisle Area Sch. v. Scott P. by and
through Bess P., 62 F.3d 520, 528 (3d Cir. 1995) (while hearing officer's credibility findings

deserve deference, decision reversed if objective evidence justifies contrary conclusion or record read in its entirety compels a contrary conclusion).  However, when the hearing officer's findings as to whether the IEP would have provided FAPE are detailed and supported by the record; there is no reason to disturb them.  Rowley, 458 U.S. at 207; N. Reading Sch. Comm., 480 F. Supp. 2d at 488.  Absent an error of law, the administrative decision should be overturned only when, in light of the record as a whole, it is clearly erroneous."  Lessard, 581 F.3d at 24.

## IV.    IDEA STATUTORY SCHEME

IDEA's central requirement is that states identify children with disabilities who need special education and prepare an IEP so that the child receives FAPE.  Cranston Sch. Dist., 2008 WL 4145980, at *4 (citing 20 U.S.C. § 1412(a)).  A school district satisfies its IDEA obligations if it complies with the Act's procedural requirements and the IEP is "reasonably calculated to enable the child to receive educational benefits."  Rowley, 458 U.S. at 206-07.  The IEP must include, at a minimum, the child's present level of educational attainment, short and long term goals for his or her education, objective criteria to measure progress towards those goals and the specific services to be offered.  Id. § 1414(d)(1)(A); see Coventry Pub. Sch., 893 F. Supp. 2d at 332.  The IEP is subject to procedural and substantive requirements, which can flow from both federal and state law.  See Roland M., 910 F.2d at 987.

In interpreting IDEA, courts must heed the caution of the Supreme Court in Board of Education v. Rowley that IDEA does not require school districts to provide special education students with the best education available or to provide instruction that maximizes the student's abilities.  458 U.S. 176, 200-01 (1982); Lt. T.B. ex rel. N.B., 361 F.3d at 83.  Rather, districts are required only to provide a "basic floor of education" that allows the student to access specialized instruction and related services individually designed to provide educational benefits; the choice

48

of methodology in providing special education and related services is the prerogative of the

school district.  Mr. I. ex rel. L.I. v. Me. Sch. Admin. Dist. No. 55, 480 F.3d 1, 10-11 (1st Cir.

2007); S. Kingstown I, at *7.  At the same time, IDEA calls for more than a trivial educational

benefit, in line with the intent of Congress to establish a "federal basic floor of meaningful,

beneficial educational opportunity."[35] D.B. ex rel. Elizabeth B, 675 F.3d at 34 (quoting

Burlington, 736 F.2d at 789).  To decide whether an IEP complies with IDEA, courts must

engage in a two-part analysis.  Rowley, 458 U.S. at 206–07.

The first prong examines the procedural adequacy of the IEP, asking "whether the state

has complied with the procedures set forth in the IDEA."  R.E. v. N.Y.C. Dep't of Educ., 694

F.3d 167, 189-90 (2d Cir. 2012) (quoting Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192

(2d Cir. 2005)).  Harmless or mere technical procedural violations do not entitle students to an

IDEA remedy.  Rather, to buttress the conclusion that a procedural violation deprived the student

of FAPE, the procedural violation must "impede[ ] the child's right to a [FAPE]," "significantly

impede[ ] the parents' opportunity to participate in the decisionmaking process regarding the

provision of a [FAPE] to the parents' child," or "cause[ ] a deprivation of educational benefits."

20 U.S.C. § 1415(f)(3)(E)(ii); see, e.g., Hazen v. S. Kingstown Sch. Dep't, No. CA 09-313 ML,

2010 WL 5558912, at *23 (D.R.I. Nov. 22, 2010), adopted by sub nom., Hazen ex rel. R.H. v. S.

Kingstown Sch. Dep't, No. CA 09-313 ML, 2011 WL 63499 (D.R.I. Jan. 7, 2011) (parents not

---

[35] There is a conflict among the circuits over the correct interpretation of Rowley's requirement that the IEP must be "reasonably calculated to enable the child to receive educational benefits."  458 U.S. at 207.  The Supreme Court recently heard oral argument in Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. Re-1, 798 F.3d 1329 (10th Cir. 2015), cert. granted, 137 S. Ct. 29 (2016), which presents the legal question whether the educational benefit to which a disabled child is entitled is simply "more than de minimis," Thompson R2-J Sch. Dist. v. Luke P., 540 F.3d 1143, 1149 (10th Cir. 2008), cert. denied, 555 U.S. 1173 (2009)), or is it a higher standard, such as "a meaningful educational benefit," as defined in L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 390 (3d Cir. 2006).  As noted in the text, in the First Circuit, the test is set out in D.B. ex rel. Elizabeth B., 675 F.3d 26 (1st Cir. 2012), which holds that "the IDEA calls for more than a trivial educational benefit, in line with the intent of Congress to establish a 'federal basic floor of meaningful, beneficial educational opportunity.'"  675 F.3d at 34.

entitled to relief for "mere technical violations" because student was not harmed and parents were not significantly prevented from participating in IEP process); Lt. T.B. ex rel. N.B., 361 F.3d at 82 ("any procedural violations were not sufficiently material to justify rejection of the IEP or tuition reimbursement"; "proposed IEP did not substantively deny . . . FAPE").  Thus, before an IEP is set aside, there must be some rational basis to believe that procedural inadequacies compromised the pupil's right to an appropriate education, seriously hampered the parents' opportunity to participate in the formulation process, or caused a deprivation of educational benefits.  Roland M., 910 F.2d at 994.

The second prong of the test weighs the substantive adequacy of the IEP by asking whether it was "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206-7.  Unlike procedural violations, "[s]ubstantive inadequacy automatically entitles the parents to reimbursement as long as the parents' alternative placement was appropriate and equitable considerations favor reimbursement."  T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 160-61 (2d Cir. 2014) (internal quotations and citations omitted).  "An IEP is substantively adequate under the IDEA 'if it . . . is likely to produce progress, not regression, and if [it] affords the student with an opportunity greater than mere trivial advancement.'"  C.W.L. & E.L. v. Pelham Union Free Sch. Dist., 149 F. Supp. 3d 451, 464 (S.D.N.Y. 2015), appeal withdrawn, (Feb. 1, 2016) (quoting Cerra, 427 F.3d at 195).  In performing the analysis of substantive adequacy, the court must be mindful that the issue is not whether the IEP was prescient enough to achieve perfect academic results, but whether it was "reasonably calculated" to provide an "appropriate" education as defined in federal and state law. See Rowley, 458 U.S. at 207; Roland M., 910 F.2d at 992.  Thus, the actions of school systems cannot be judged exclusively in hindsight: "[a]n IEP is a snapshot, not a retrospective."  Id.

50

Beyond the broad questions of a student's general capabilities and whether an educational plan identifies and addresses his or her basic needs, "courts should be loath to intrude very far into interstitial details or to become embroiled in captious disputes as to the precise efficacy of different instructional programs." Id.; see Rowley, 458 U.S. at 202.

An essential element of the IDEA scheme is that parents of a child with a disability shall have the opportunity "to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education." 20 U.S.C. § 1415(b)(1). Parent participation in the decision-making process must include the opportunity for meaningful input into all decisions affecting the child's education, not "mere form." Deal v. Hamilton Cnty. Bd. of Educ., 392 F.3d 840, 858 (6th Cir. 2004); see FB v. N.Y. City Dep't of Educ., 132 F. Supp. 3d 522, 545 (S.D.N.Y. 2015) (parents denied right to meaningful participation in light of evidence that district did not respond to any of their input letters and failed to provide relevant and timely information as to the proposed placement); K.R. ex rel. Matthew R. v. N.Y. City Dep't of Educ., 107 F. Supp. 3d 295, 305 (S.D.N.Y. 2015) (parents denied right to meaningful participation in light of evidence that meeting lasted about thirty minutes, discussion general and mostly between team members while parents "weren't privy to what they were talking about"). "School officials must have an open mind and be willing to listen and consider the parents' input. Meaningful participation cannot be assumed just because the parents were present and allowed to speak." Doe v. Attleboro, 960 F. Supp. 2d at 296.

Another of IDEA's procedural safeguards to ensure that states are providing FAPE is tuition reimbursement for private school placement. See 20 U.S.C. §§ 1412(a)(10)(c)(ii), 1415(k); Coventry Pub. Sch., 893 F. Supp. 2d at 333. Entitlement to reimbursement is

contingent upon a showing that the parents diligently pursued appropriate services from the public school system, yet the school system failed to provide those services, and that the private placement is a suitable alternative.  C.G. ex rel. A.S., 513 F.3d at 289 (citing Florence Cty. Sch. Dist. Four v. Carter, 510 U.S. 7, 12 (1993); Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359, 370 (1985).  Thus, "IDEA provides that 'a court or a hearing officer may require the agency to reimburse the parents for the cost of . . . enrollment [in a private school] if the court or hearing officer finds that the agency had not made a free appropriate public education [FAPE] available to the child in a timely manner prior to that enrollment."  Cranston Sch. Dist., 2008 WL 4145980, at *5 (quoting 20 U.S.C. § 1412(a)(10)(c)(ii)).  However, "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk"; if the court determines that the proposed IEP was appropriate, the parents are barred from reimbursement.  Sch. Comm. of Burlington, Mass., 471 U.S. at 373-74.  "Reimbursement must be denied . . . if the school system proposed and had the capacity to implement an appropriate IEP."  Roland M., 910 F.2d at 999-1000; Burlington, 736 F.2d at 799.

Once the parents seeking tuition reimbursement establish that the proposed IEP was not appropriate, they next must prove that the private school they chose is a proper placement.  See Florence, 510 U.S. at 15.  If they clear that hurdle, reimbursement is "a matter of equitable relief, committed to the sound discretion of the district court."  Burlington, 736 F.2d at 801, aff'd sub nom., Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass., 471 U.S. 359 (1985).  For a private school to be "proper," the child's enrollment must be "reasonably calculated to enable the child to receive educational benefits."  Rowley, 458 U.S. at 207.  That does not mean that the private school must meet all state standards or be included on the state's

list of approved schools.  <u>Florence</u>, 510 U.S. at 14 ("[I]t hardly seems consistent with the Act's

goals to forbid parents from educating their child at a school that provides an appropriate

education simply because that school lacks the stamp of approval of the same public school

system that failed to meet the child's needs in the first place.").  "The court must focus instead on

the substance of the private school's teaching and services." <u>Cranston Sch. Dist.</u>, 2008 WL

4145980, at *12 (citing <u>Florence</u>, 510 U.S. at 11).  A private school placement is not proper

because it produces educational success, or because its chief benefits are the kinds of educational

and environmental advantages and amenities that might be preferred by parents of any child,

disabled or not.  <u>Gagliardo v. Arlington Cent. Sch. Dist.</u>, 489 F.3d 105, 115 (2d Cir. 2007).

Rather, "unilateral private placement is only appropriate if it provides education instruction

*specifically* designed to meet the *unique* needs of a handicapped child."  <u>Id.</u> (citing <u>Rowley</u>, 458

U.S. at 188-89) (emphasis added).

## V.    ANALYSIS AND RECOMMENDATIONS

The Parent's threshold legal argument is that the hearing officer's Decision fails to make

credibility determinations, fails to cite to the testimony or the expert reports, fails to discuss the

issues and is completely devoid of any factual basis for its sparsely-stated legal conclusions.

ECF No. 10-1 at 17.  Based on these deficits, and in reliance on <u>Marc M. ex rel. Aidan M. v.</u>

<u>Department of Education, Hawaii</u>, 762 F. Supp. 2d 1235, 1242 (D. Haw. 2011), she asks this

Court to set aside the Decision as entitled to no deference and, rolling up the judicial sleeves, to

perform a *de novo* review of the evidence based on the transcripts, weighing credibility and

sifting through the dueling opinions of experts and educators.  ECF No. 10-1 at 14-15.  As laid

out in my proposed findings of fact, the foundation for this argument founders on the detailed

fact-finding reflected in the Decision, particularly when read in light of the totality of the record,

including the transcripts where the credibility findings are explicit.  Although the Decision has

few pin-point citations to the record, the law is clear that if the hearing officer appears to have

overlooked an issue or failed to cite to all of the evidence supporting her findings, the Court will

then give each fact a careful second look.  R.B., ex rel. F.B. v. Napa Valley Unified Sch. Dist.,

496 F.3d 932, 943 (9th Cir. 2007).  As long as the hearing officer's decision is "well-reasoned,"

with "well-supported" findings and conclusions, and the court's independent review of the

evidence, including testimony or exhibits that the hearing officer may have overlooked, results in

consistent findings and conclusions, there is no need for a remand.  Id.  Thus, the judicial work is

"involved oversight," analyzing the hearing officer's Decision to determine if she properly

weighed the proffered facts and correctly applied the applicable law.  Cape Elizabeth Sch. Dist.,

832 F.3d at 83.  That is the task to which I turn next.

### A.    Effect of the Final Judgment in the Prior Litigation

I begin with an issue that the parties and the hearing officer did not address – whether the

prior litigation, S. Kingstown I, II, raises the bar of claim or issue preclusion as to any of the

claims that the Parent now asserts.  With one important exception, I find that it does not.  The

exception is the Parent's attempt to reprise her largely failed argument that the District was

required to perform, at its expense, more of the evaluations that she demanded at the IEP meeting

of October 9, 2012, based on changed circumstances in the summer and early fall of 2012.

Federal preclusion law applies to determine the effect to be given a prior federal court

judgment.  Airframe Sys., Inc. v. Raytheon Co., 601 F.3d 9, 14 (1st Cir. 2010).  Claim preclusion

bars parties from relitigating claims that could have been made in an earlier suit, not just claims

that were actually made; "pouring old wine into a new bottle does not make the wine into new

wine." Medina-Padilla v. U.S. Aviation Underwriters, Inc., 815 F.3d 83, 87 (1st Cir. 2016);

54

Airframe Sys., at 14.  Claim preclusion is proper if (1) the earlier suit resulted in a final judgment

on the merits, (2) the causes of action asserted in the earlier and later suits are sufficiently

identical or related, and (3) the parties in the two suits are sufficiently identical or closely related.

Id.  Issue preclusion is similar; it "prohibits a party from re-litigating issues that have previously

been adjudicated."  Enica v. Principi, 544 F.3d 328, 336 (1st Cir. 2008).  To preclude the

litigation of an issue based on a prior adjudication, a party must establish "(1) an identity of

issues, (2) actuality of litigation, (3) finality of the earlier resolution, and (4) the centrality of the

adjudication."  B & B Hardware, Inc. v. Hargis Indus., Inc., 135 S. Ct. 1293, 1302-03 (2015)

("Once a court has decided an issue, it is 'forever settled as between the parties.'") (citing

Baldwin v. Iowa State Traveling Men's Ass'n, 283 U.S. 522, 525 (1931)).

       In this instance, the earlier case resulted in final judgment on the merits, and the parties in

both matters are unambiguously identical.  More complex is the relationship between the prior

and current claims and issues.  For claim preclusion, the inquiry must "boil[] down to whether

the causes of action arise out of a common nucleus of operative facts."  Mass. Sch. of Law at

Andover, Inc. v. Am. Bar. Ass'n, 142 F.3d 26, 38 (1st Cir. 1998).  Claims arising out of the

common nucleus of operative facts are precluded whether actually resolved by the court in the

previous case or not.  Airframe Sys., 601 F.3d at 15.  For issue preclusion, the issue must have

been actually adjudicated and central to the final judgment.  Enica, 544 F.3d at 336.

       The prior claim is readily defined – in S. Kingstown I, II, the Parent argued that the

District's refusal to perform or pay for the evaluations that she demanded at the October 9, 2012,

IEP meeting denied P.J. his right to FAPE.  The final judgment in that case resolved the issue.  In

the current proceeding, the Parent again claims that the District's refusal to perform or pay for

the evaluations demanded at the October 2012 IEP meeting contributed to the denial of FAPE;

she includes the omitted evaluations among a long list of IDEA violations she claims resulted in

the denial of FAPE from August 2012 through August 2014 and beyond.  As long as the inquiry

is limited to the evaluations demanded on October 9, both the prior and current claims arise out

of the precise same nucleus of operative facts, while the issues on which the prior claim was

predicated were actually adjudicated and plainly central to the judgment.  Therefore, whether

characterized as issue preclusion or claim preclusion, the claim that the District's refusal to

perform or pay for the evaluations demanded by the Parent at the October 9, 2012, IEP meeting

denied P.J. his right to FAPE is barred from being relitigated now.

     The practical impact of this conclusion on this case is not so simple.  The Parent now

claims that the lack of evaluations was an ongoing failure that tainted each year's IEP, resulting

in a denial of FAPE over nearly a three-year period.  In S. Kingstown II, the Court specifically

declined to decide how far into the future the limitations of that Settlement Agreement would

persist: "[t]he extent to which conditions must change, as they often do as children grow and

develop, before a release no longer bars a requested evaluation is an issue we do not address in

this appeal."  S. Kingstown II, 773 F.3d at 355.  To implement this holding, S. Kingstown II

carved out an exception permitting a parent to seek services foreclosed by a settlement based on

changed circumstances that were not known at the time the settlement was executed.  773 F.3d at

354-55.  During the hearing before the Circuit panel, Plaintiff was invited by the Court to present

any changed circumstances that would justify her demand for more evaluations on October 9,

2012, but were not known at the time of the Settlement Agreement.  Id. at 355.  She pointed only

to P.J.'s extended absence from school during the summer of 2012, which the Court rejected

because it was a continuation of the same circumstance that had led to the execution of the

Settlement Agreement.  S. Kingstown II, 773 F.3d at 355; see S. Kingstown I, 2014 WL 197859,

at *14 (finding that the Parent failed to establish changed circumstances not knowable at the time of the Settlement Agreement).  Accordingly, S. Kingstown I, II actually adjudicated whether changed circumstances during the summer or early fall of 2012 justified the demand for more evaluations and held that those circumstances were not present.  S. Kingstown II, 773 F.3d at 355.  Therefore, S. Kingstown I, II forecloses further litigation of the issue of such changed circumstances up to the making of the October 9 demand.

After the making of the October 9, 2012, demand, the landscape changes.  The Parent may now present materially changed circumstances that arose after October 9, 2012, and claim that, in light of such circumstances, the District should have performed or paid for one or more of the October 9, 2012, evaluations and that the failure to do so denied her son FAPE.  However, her attempts, during this litigation, to take a second run at proving changed circumstances justifying more evaluations during the summer and early fall of 2012 should have been rejected by the hearing officer based on the preclusive effect of the final judgment in S. Kingstown I, II.

One more wrinkle remains – in her current attempt to relitigate changed circumstances, the Parent relies on her testimony that she was not told that P.J. had been accepted at the Wolf School and that P.J. did not receive educational services in the summer of 2012.  Vol. VIII at 923, 928, 930-31.  In well-supported findings, the hearing officer properly rejected both of these facts in the face of the uncontroverted evidence that the Parent was told of P.J.'s acceptance in May 2012 and that P.J. received educational services at the Wolf School during the summer of 2012.  Dec. at 24-25; see Vol. XI at 1338-41, 1368-69.  Thus, my recommendation is contingent – to the extent that this Court does not defer to these findings, I recommend that the Parent's claims that the District should have performed or paid for the October 9, 2012, evaluations based on her son's serious adverse reaction to the Wolf School's refusal to admit him in the summer of

2012, and on the adverse effect caused by the lack of educational services during the summer of 2012, be rejected because they are barred by the preclusive effect of the prior litigation.

In contrast to the Parent's October 9, 2012, demand for more evaluations, her current claim that P.J. was denied FAPE while being educated at the Wolf School is not a claim that could have been brought, or was actually adjudicated, in the prior litigation. The Parent's claim that P.J. was denied FAPE while at Wolf focuses on an array of matters, including P.J.'s educational progress, the Parent's participation in IEP meetings and the transportation issue, none of which had crystalized until after the S. Kingstown I, II due process proceeding was initiated on October 30, 2012, nor were any of these issues actually litigated. As such, none of them are subject to the preclusion bar arising from S. Kingstown I, II.

**B.      Effect of the Settlement Agreement**

As the First Circuit held in the prior litigation, "Congress also expressly allowed parties to resolve [educational disputes] through settlements. And when parties do so, the settlements must be given appropriate effect." S. Kingstown II, 773 F.3d at 356. In this proceeding, the Parent makes an array of arguments to avoid the legal effect of the Settlement Agreement's provisions affecting the 2012/2013 school year, including the agreement limiting the need for more evaluations, the agreement that P.J. should be placed at the Wolf School and the agreement that the Parent would transport him to school if he refused the transportation offered by the District. See R-A. To the extent that her arguments are based on the recycled argument that more evaluations are justified based on changed circumstances, they may be set aside because of the preclusive effect of S. Kingstown I, II. To the extent that her arguments are based on avoiding other provisions of the Settlement Agreement based on changed circumstances during

the summer of 2012, they may be set aside based on the well-supported findings of the hearing officer that both of the proffered changed circumstances never happened.

By contrast, her argument that it was not foreseeable that the Wolf School would fail to provide FAPE falls outside the terms of the Settlement Agreement.  S. Kingstown II holds that an IDEA settlement cannot indefinitely bargain away a child's statutory right to FAPE without regard to changed circumstances as may arise as the child develops.  773 F.3d at 355.  While the Parent is not barred from arguing that compliance with the Settlement Agreement denied her son his right to FAPE, id., the fact that she agreed to its provisions calls into question the credibility of her argument that the very educational services she demanded turned out to be legally deficient.

I find that the hearing officer's treatment of the Settlement Agreement is entirely consistent with these principles.  The hearing officer noted the impact of the Agreement, for example finding that the Parent's provision of transportation during the 2012/2013 school year was consistent with the Settlement Agreement.  Dec. at 28.  She properly considered that the Wolf School placement was "at the behest of the mother."  Dec. at 25.  Nevertheless, she also looked beyond the Settlement Agreement, to the substance of the educational services that P.J. received, to determine whether he was afforded FAPE, including during the period covered by the Settlement Agreement.  Dec. at 26 ("[i]rrespective of the Settlement Agreement that specifically prescribed education at Wolf, the Hearing Officer will address the issue of FAPE for the 2012-2013 and 2013-2014 school years at Wolf").  In so doing, she rendered a decision consistent with the First Circuit's holding that "settlements must be given appropriate effect," but also that a Settlement Agreement cannot "bargain away . . . the statutory right to a free and appropriate public education."  S. Kingstown II, 773 F.3d at 354, 356.

### C.     Was P.J. Afforded FAPE at the Wolf School?

The Parent has launched an *ex post facto* attack on virtually every aspect of the educational services provided by the District during P.J.'s seventh and eighth grade years at the Wolf School.  Based on her interpretation of the Settlement Agreement, she argues that she was released by its terms from her own choice of the Wolf School as the best placement for her son, and that she never believed that the Wolf program was appropriate, so that the District's failure to offer her other placements is a denial of FAPE.  She argues that the District failed to provide P.J. with the specialized transportation called for by his IEP, resulting in a denial of FAPE.  She argues that the IEPs for both school years failed to provide FAPE because they were developed based on an insufficient number of evaluations and without proper consideration of the evaluations that had been performed.  She argues that the delay in meeting to develop the 2012/2013 IEP until after the start of the school year is a procedural violation that caused the denial of FAPE.  She argues that all of these IDEA violations had a substantive adverse impact in that P.J. made, at best, trivial academic progress during his time at the Wolf School.  The only benefit to P.J. from the Wolf placement that she acknowledges is P.J.'s "social/emotional" progress.

In her Decision, the hearing officer considered and rejected every one of these arguments.  In so doing, she accepted as credible the testimony of the educators, which contradicted the testimony of the Parent and her educational advocate.  The hearing officer considered the competing opinions of an array of experts and found more persuasive the opinions that aligned with those of the educators who had worked closely with P.J. over an extended period of time.  Her finding of steady academic progress, which is well anchored in the testimony of both experts and educators, renders harmless the acknowledged handful of procedural IDEA violations.

60

### i.   Parent's Professed Belief that the Wolf School Was Not Academically Appropriate

The analysis begins with the Parent's testimonial drumbeat, echoed by her educational advocate, that she never agreed to the Wolf School, never acknowledged that it was an appropriate placement and consistently believed that it was not.  The hearing officer properly rejected each proposition because the testimony on which each was based lacked credibility.  Endorsing those findings, I will not replow that ground, except to note that the Parent's threat to invoke her stay-put rights at the Wolf School if the District tried to place P.J. elsewhere for the 2013/2014 school year and her invocation of the Wolf School program as the stay-put while the current due process is pending constitute powerful admissions that she considered Wolf's educational program to be appropriate.  Stay-put is intended to allow the child to remain at the last appropriate educational placement at which an agreed-upon IEP was being implemented.  See Roland M., 910 F.2d at 1000.  Mindful of the hearing officer's finding that the Parent has a sophisticated understanding of IDEA, Vol. IX at 1100, these stay-put demands permit the inference that she considered Wolf to be an appropriate "current educational placement" at which an agreed-upon IEP was being implemented.

Based on my independent review of the record, I recommend that this Court afford full judicial deference to the hearing officer's credibility-based rejection of the Parent's claim that she was denied the right of input in choosing the Wolf School and that she persistently believed that the educational services provided at Wolf were inadequate.  Cape Elizabeth Sch. Dist., 832 F.3d at 82-84 (administrative findings that are well reasoned and based on greater familiarity with witnesses worthy of deference); Doe v. Attleboro, 960 F. Supp. 2d at 294-95 (hearing officer's credibility determinations entitled to particular deference).

61

### ii.    Transportation

I turn next to the Parent's claim that the District failed in its obligation to provide specialized transportation.  There is no error in the hearing officer's finding – amply supported by the testimony – that the District developed and offered an appropriate transportation plan but the Parent herself blocked its implementation.  That finding, in turn, led to the hearing officer's holding that, "[u]nder the circumstances, the district was under no further obligation to provide transportation as a condition of FAPE."  Dec. at 28.  This holding aligns with applicable law. Rachel L. v. Hawaii, Civil No. 11-00756 LEK-BMK, 2012 WL 5383527, at *4 (D. Haw. Oct. 30, 2012) (when hearing officer properly finds that district's failure was caused by parent's obstruction, parent may not prevail); A.R. v. Hawaii, Civil No. 10–00174 SOM/RLP, 2011 WL 1230403, at *13 (D. Haw. Mar. 31, 2011) (court should not provide remedy to parent for alleged IDEA violation that she herself caused).  Based on the foregoing, I recommend that the Court reject the Parent's claim that the District failed to offer an appropriate transportation plan while P.J. was at the Wolf School and that the Court affirm the hearing officer's holding that her refusal to allow the plan to be implemented ended the District's obligation.

### iii.    Evaluations

The next link supporting the Parent's conclusion that P.J. did not receive FAPE at the Wolf School is focused on the claim that the District had insufficient information from evaluations and assessments to create and implement an adequate educational plan.  See S. Kingstown II, 773 F.3d at 346-47 ("Evaluations are integral to the way IDEA works.").  While she concedes, as she must, that the independent evaluation ordered by the hearing officer in S. Kingstown I, II was paid for by the District, the Parent contends that the resulting report was not properly considered and the District wrongly refused to do more evaluations.  Specifically, based

on the testimony of the educational advocate, she argues that the lack of an assistive technology evaluation materially impacted P.J. because his IEP had goals and accommodations related to assistive technology.  See Vol. IV at 383-84.  She also contends that the lack of a comparable set of tests left Dr. Kotula unable to compare her test results to a baseline and unable to opine on P.J.'s progress at the Wolf School.  ECF No. 10-1 at 21.

The hearing officer properly rejected the proposition that the Parent's persistent complaints about evaluations constitutes evidence that the lack of evaluations adversely affected P.J.'s education.  Dec. at 6, 19, 27; S. Kingstown II, 773 F.3d at 355 (parent's complaints about evaluations not legally sufficient basis for hearing officer to order them).  Rather, the hearing officer found that the District had procured and considered the independent evaluations from 2009, the 2012-summer evaluations, the do-over of the educational evaluation by Dr. Kotula, and the evaluations, assessments and testing performed by the Wolf School teachers, coupled with their "constantly assessing him via his daily school work and participation in their program," as well as Dr. Leimkuhler's evaluation, which had been procured by the Parent.  Dec. at 13-14, 21-22.  To conclude that this was enough and that more testing was not necessary, the hearing officer relied on the opinions of Ms. Eagan and the Wolf School educators, coupled with the expert opinion of Dr. Osowiecki.  Dec. at 21 ("Personnel at The Wolf School did not support further evaluations and/or testing as they felt that the student was making appropriate growth . . . doing well, able to access all of his educational material."); Vol. X at 1244-51 (Dr. Osowiecki testifies, "I don't know that . . . putting him through more testing is necessary.").  No qualified expert or educator testified that more tests were needed.  Dr. Kotula recommended more testing in the future; otherwise, she said only that the lack of an educational evaluation from the summer of 2012 left her unable to measure progress since P.J. started Wolf.  Vol. III at 282, 295.  She did

not opine that the lack of testing rendered any plan inadequate or impaired the ability of

educators to formulate an IDEA-compliant IEP.  What remains is the opinion of the educational

advocate that more evaluations were needed, which the hearing officer properly ignored.[36]

To corroborate this well-supported conclusion that more evaluations were not needed, the

hearing officer pointed to her findings that "[t]he student was definitely receiving instruction that

was designed to meet his unique needs, and he was supported by services and accommodations

that were necessary for him to benefit from his education" and that neither Wolf nor the District

"were required to acquiesce in the parent's requests when the evidence demonstrated that the

child was progressing well."  Dec. at 27.  Put differently, the conclusion that more evaluations

were not needed is confirmed by P.J.'s steady educational progress.  See Roland M., 910 F.2d at

991 (central issue is "whether the [IEP] addresses the child's special educational needs so as to

assure his maximum possible development in the least restrictive environment consistent with

that goal"); Stephanie M. Poucher, The Road to Prison Is Paved with Bad Evaluations: The Case

for Functional Behavioral Assessments and Behavior Intervention Plans, 65 Am. U. L. Rev. 471,

491, 498-99 (2015) (if no substantive violation, lack of evaluations does not confer remedy).

Before turning to that critical finding – steady academic progress at the Wolf School –

I take a brief detour to consider the procedural violations identified in the RIDE letters.

### iv.    Procedural Violations

RIDE found that the District committed a handful of procedural violations during the fall

of 2012, as laid out in its February and April 2013 letters.  P-62 (RIDE finds that District's

---

[36] The educational advocate testified that P.J. needed an assistive technology evaluation and related behavioral assessment because the lack of assistive technology increased anxiety and triggered home-based "behaviors" while completing homework.  See Vol. IV at 383-84.  Because she lacked both the educational expertise to opine about assistive technology and personal knowledge regarding how P.J. functioned at home while doing homework, her testimony was properly disregarded.

failure to give adequate prior written notice of the November 13, 2012, IEP meeting at which

P.J.'s eligibility was to be discussed and failure to have the IEP meeting until after the start of the

2012/2013 school year amount to technical violations); P-73 (RIDE finds that District's decision

to end October 9, 2012, IEP meeting after only forty-five minutes affected Parent's right to

participate and amounts to a technical violation).

      The procedural violations related to the insufficiency of one meeting notice and the

inadequate length of one meeting pale before the hearing officer's finding that, "[f]rom 2012

through July 2014, there were approximately thirteen IEP meetings, most of which were initiated

by the mother."  This finding is further buttressed by the recordings of many of the 2013 and

2014 IEPs meetings, which are powerful evidence of the Parent's significant and substantive

input into her son's educational planning.  Dec. 5-6.  Mindful that procedural violations must

compromise the student's right to an appropriate education to rise to a IDEA violation, this

finding is more than sufficient to establish that these issues, as identified by RIDE, are mere

technical violations.  Roland M., 910 F.2d at 994 ("Before an IEP is set aside, there must be

some rational basis to believe that procedural inadequacies compromised the pupil's right to an

appropriate education, seriously hampered the parents' opportunity to participate in the

formulation process, or caused a deprivation of educational benefits.").  Gilding the lily are the

documents in evidence, which establish that eligibility (the topic that should have been included

in the notice of the November 13, 2012, IEP meeting) was discussed at length, over and over, at

IEP meeting after IEP meeting, and was repeatedly addressed in the Parent's written input and

the District's responses.  Dec. at 6; see P-80; P-133; P-137; P-170; P-211; R-AA to RR.  The

preponderance of the evidence is clear – neither the failure to provide prior written notice for the

November 13, 2012, IEP meeting nor the limitation on the length of the October 9, 2012, IEP meeting had any substantive adverse impact on P.J.'s education.

That leaves the failure of the District to have an IEP meeting prior to the commencement of the 2012/2013 school year.  To review the facts, the District interpreted the Settlement Agreement as permitting the postponement of the IEP meeting because P.J. had been absent for much of the preceding school year, none of the necessary evaluations had been done, and the Wolf School had not completed its customary initial forty-five-day period of testing, evaluation, assessment and observation.  The District understood that the IEP meeting would be held and the new IEP would be developed after all critical information was collected.  See P-35.  When the Parent requested that the meeting be held sooner, the District scrambled and the meeting was held on October 9, 2012, although it lasted only forty-five minutes and was followed by the Parent's repudiation of the Settlement Agreement by demanding new evaluations, and abruptly forcing the District into the second due process proceeding.  Despite what must have been chaotic circumstances, another meeting was quickly held on November 13, 2012, although the prior written notice was overlooked.  Considerations of fairness and practicality require the Court to look past these technical missteps to the substance of the educational services being delivered, Roland M., 910 F.2d at 994, and to focus on the hearing officer's conclusion that the IEP resulting from this process, as implemented at the Wolf School, afforded P.J. FAPE.  Dec. at 27 ("In sum, he was receiving FAPE.").  If this conclusion is correct, the lack of an IEP meeting during the summer of 2012 did not compromise P.J.'s right to an appropriate education.

Accordingly, I turn next to the hearing officer's finding that the education P.J. received at the Wolf School during both the 2012/2013 and 2014/2015 school years resulted in steady academic progress and therefore constituted FAPE.

66

### v.     Academic Progress

The last and most material leg in the Parent's attack on the education services received at the Wolf School focuses on her belief, corroborated by her educational advocate, that P.J. made trivial educational progress while at Wolf and therefore was denied FAPE.  To buttress the argument, she reprises her flawed factual claims that no educational services were received for five months after the signing of the Settlement Agreement and no assistive technology evaluation was performed.  More substantively, she launches a three-pronged factual attack on the finding of steady progress.  Dec. at 26.  First, she argues that Dr. Kotula's test results showing that P.J. was not functioning at grade level with respect to certain skills is evidence of lack of progress; second, she points to the lack of significant change in the annual IEP goals; and third, she points to P.J.'s ability to write a two-thousand-word essay after only seven months at the Gow School. ECF No. 10-1 at 28.  To shore up these arguments, she alleges that the hearing officer's conclusion of steady progress is unsupported by "even one reference to the specific testimony and/or reports 'on the record' or legal analysis."  ECF No. 10-1 at 25.

Taking the last point first, the contention that the hearing officer's pivotal holding – that P.J. made "steady progress" and that the "evidence demonstrated that the child was progressing well"[37] – is not anchored in the evidence is simply wrong.  Dec. at 26-27.  To the contrary, it is expressly based on "all of the testimony and reports on the record," Dec. at 26, with specific findings set out in the Decision that are firmly grounded in the testimony of the educators and in the testimony and reports of the experts.  See Dec. at 10-11 (noting that Ms.

---

[37] As noted *supra*, n.35, the Supreme Court has under advisement whether Rowley requires an educational benefit that is better than merely trivial.  Endrew F. ex rel. Joseph F., 798 F.3d 1329, cert. granted, 137 S. Ct. 29, 195 L. Ed. 2d 901 (2016).  In this case, the hearing officer deployed a higher standard than "merely more than a trivial education benefit," L.E.v. Ramsey, 435 F.3d at 390, in that she found that P.J. made "steady progress," that there was "no evidence that progress was slow at all," and that "the evidence demonstrated that [he] was progressing well."  Dec. 25-26.  Accordingly, however Endrew F. ex rel. Joseph F. is decided, there is no legal error in this case.

Seal, P.J.'s math/science/homeroom teacher, concluded that "he absolutely made a lot of progress at Wolf, and that it was an appropriate placement for him"); Dec. at 11-12 (noting that Dr. Smith, P.J.'s therapist, concluded that "student did tell Mr. Smith that he was comfortable at The Wolf School"); Dec. at 21 (noting that Ms. Eagan of District concluded that "[p]ersonnel at The Wolf School did not support further evaluations and/or testing as they felt that the student was making appropriate growth . . . doing well, able to access all of his educational material"); Dec. at 23 (noting that Ms. Gagne, P.J.'s reading, writing, social studies and homeroom teacher, concluded that P.J.. was "progressing well with [Wolf] model" of small classes with help for his written language disorder, phonics and spelling and access to technology); Dec. at 24 (noting that Ms. Granoff, founder and director of admissions at the Wolf School, concluded that P.J. "in his two years at Wolf, progressed well educationally, socially and emotionally").

Other record evidence amply corroborates the finding of steady progress.  For example, neuropsychologist Dr. Brett Leimkuhler evaluated P.J. after he had been attending the Wolf School for a year and a half; it was his learned opinion that "[P.J.] is doing well at the Wolf School," as well as that the Wolf School's "academic curriculum and programming" were among the reasons that P.J. has "been successful" there.  P-127-6; see P-127-5 ("he appears to have improved in some basic mathematics skills since his evaluation by Dr. Kotula in December 2013").  The only arguable contrary opinion (apart from the Parent and her educational advocate) is that of Dr. Kotula, who criticized the IEPs for their lack of reading goals.  Vol. III at 293-96. However, Dr. Kotula did not opine that P.J. had failed to make progress at the Wolf School; rather, she testified only that she could not tell because there was no baseline to which she could compare her test results.  Vol. III at 295.

There is no need to linger long over the balance of the Parent's arguments.  For starters, as the hearing officer concluded, Dr. Kotula's conclusion that P.J. was functioning below grade level in certain areas is undisputed but immaterial to whether his IEP was resulting in meaningful progress and affording FAPE.  Roland M., 910 F.2d at 993 ("comparative academic progress, in and of itself, is not necessarily a valid proxy for, or determinative of, the degree to which an IEP was reasonably calculated to achieve the mandated level of educational benefit").  Nor is the conclusion of steady progress undermined by the similarity of year-over-year goals in P.J.'s IEPs.  Doe ex rel. Doe v. Hampden-Wilbraham Reg'l Sch. Dist., 715 F. Supp. 2d 185, 198-99 (D. Mass. 2010) (where hearing officer found that student made progress, no error in ignoring evidence that IEP showed that student has worked towards some similar goals from year to year).  And the last leg – the argument that P.J. has made substantial progress at the Gow School because he was able to write a two-thousand-word essay within seven months of matriculating – seems to confirm rather that undermine the hearing officer's conclusion of steady progress at the Wolf School.  If P.J. had not made steady and meaningful progress at Wolf, it is unlikely that he could have such an achievement after only seven months at the Gow School.

Based on the foregoing and on my independent weighing of the evidence on a preponderance-calibrated scale, I find that the hearing officer's determination that P.J. made steady progress at the Wolf School through the implementation of the District's IEPs is amply supported by the evidence, consistent with the law and well entitled to this Court's deference.  Based on the finding of steady progress, coupled with the balance of the hearing officer's findings regarding P.J.'s education during the Wolf years, I recommend that this Court reject all of the Parent's attacks on the sufficiency of the evaluations, the timing of the IEP meetings and the appropriateness of the IEP's approach to reading, and affirm the hearing officer's holding

that P.J. was afforded FAPE during the 2012/2013 and 2013/2014 school years.  Rowley, 458

U.S. at 207 (school district complies with IDEA's substantive requirements if IEP is "reasonably

calculated to enable the child to receive educational benefit[s]"); Sebastian M., 685 F.3d at 86

(hearing officer's finding, amply supported by the administrative record, that student "made

progress commensurate with his ability" establishes adequacy of IEPs); Slater v. Exeter-W.

Greenwich Reg'l Sch. Dist., No. CA 06-572 ML, 2007 WL 2067719, at *10 (D.R.I. July 16,

2007) (finding that student made "meaningful progress" supports holding of no failure to afford

FAPE).

### D.      Did the 2014/2015 IEP with Placement at ASA Afford P.J. FAPE?

#### i.      2014/2015 IEP

The Parent's primary critique of the 2014/2015 IEP is that the District erred in its

determination that P.J. is eligible for services based on an "emotional disorder."  The thrust of

the argument appears to be that the 2014/2015 IEP bases P.J.'s eligibility for special education

services on anxiety, which is an emotional disorder, and not on autism, which is separately

classified by IDEA.  To support this argument, she relies on Dr. Leimkuhler's evaluation, which

lists autism along with many other diagnoses (including anxiety) and emphasizes the impact of

autism on the executive function of the brain.  She also points to Dr. Smith's longstanding

opinion that autism is the primary diagnosis in that it impacts P.J.'s ability to deal with

frustration.  She asks the Court to reject the hearing officer's reliance on Dr. Osowiecki's expert

opinion that P.J. is correctly classified because the primary barrier affecting his access to

education is anxiety, whatever his diagnoses may be.  The Osowiecki opinion, she contends, is

flawed because Dr. Osowiecki did not evaluate P.J.; ignoring Dr. Osowiecki's credentials, the

Parent labels her as "a hired gun masquerading as an expert."  ECF No. 10-1 at 37.

The testimony regarding the District's eligibility determination came from Ms. Eagan and Dr. Osowiecki.  Ms. Eagan explained, "[w]hat we looked at was what the diagnosis of the disability that was interfering with his ability to end up getting into school, which was the high anxiety, and so we went through the most interfering, he has numerous diagnoses, which was interfering to the degree that he needed the special education in that area, and that's the anxiety." Vol. IX at 1086-87.  Dr. Osowiecki confirmed that P.J.'s anxiety had more impact on access to education than his autism.  Vol. X at 1214.  Based on this testimony, which is amply supported, and uncontroverted, by other record evidence, the hearing officer found that P.J. "has been hampered by his primary diagnosis of anxiety and his resulting absences from school."  Dec. at 26; see Vol. II at 99, 162 (despite opinion that autism is primary diagnosis and that "emotional disorder" is not "a primary diagnosis at all," Dr. Smith agrees that primary educational impact is school refusal due to anxiety).  No qualified expert or educator testified that the District's eligibility determination was wrong or that P.J. did not receive needed services because of an incorrect eligibility determination.

As a threshold matter, the District's approach to eligibility appears to have been consistent with the approach mandated in the applicable federal and state regulations.  See 34 C.F.R. § 300.8(c); R.I. Code R. 21-2-54:A § 300.8(c).  To receive IDEA special education, a child must qualify as a "child with a disability," defined as a child "with . . . serious emotional disturbance (referred to in this chapter as "emotional disturbance"), . . . autism, . . . or specific learning disabilities"; and "who, by reason thereof, needs special education and related services." 20 U.S.C. § 1401(3)(A); Mr. I. ex rel. L.I., 480 F.3d at 4-5.  The relevant regulation, codified at 34 C.F.R. § 300.8(c)(4)(i); R.I. Code R. 21-2-54:A § 300.8(c)(4)(i), defines "emotional disturbance," which includes anxiety, as follows:

71

> Emotional disturbance means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:
>
> . . .
>
> (E) A tendency to develop physical symptoms or fears associated with personal or school problems.

34 C.F.R. § 300.8(c)(4)(i); R.I. Code R. 21-2-54:A § 300.8(c)(4)(i).  Consistent with this regulation, Ms. Eagan clarified that P.J.'s eligibility is based on the "tendency to develop . . . fears associated with personal or school problems." Vol. IX at 1086-87.  The regulations also define "autism" as a separate eligibility category in 34 C.F.R. § 300.8(c)(1); R.I. Code R. 21-2-54:A § 300.8(c)(1).  However, this regulation specifies: "[a]utism does not apply if a child's educational performance is adversely affected primarily because the child has an emotional disturbance, as defined in paragraph (c)(4) of this section." 34 C.F.R. § 300.8(c)(1)(i); see R.I. Code R. 21-2-54:A § 300.8(c)(1)(i).  Similarly, eligibility can be based on a "specific learning disability," but that provision also specifies that a "specific learning disability does not include learning problems that are primarily the result of . . . emotional disturbance . . . ." 34 C.F.R. § 300.8(c)(10)(ii); R.I. Code R. 21-2-54:A § 300.8(c)(10)(ii).

These regulations make plain that, for a child with multiple diagnoses like P.J., a school district is not supposed to cherry-pick among them, as the Parent urges.  The Parent does not explain how her eligibility argument[38] meshes with the regulatory mandate that "[a]utism does not apply if a child's educational performance is adversely affected primarily because the child has an emotional disturbance." 34 C.F.R. § 300.8(c)(1)(i); R.I. Code R. 21-2-54:A §

---

[38] The Parent's input about eligibility during the June 30, 2014, IEP meeting suggests that neither she nor her educational advocate (who was also present) considered the guidance in these regulations.  On the recording, the Parent can be heard aggressively attacking the District's eligibility classification, at times raising her voice to say that her son is not "emotionally disturbed." P-241.  These statements are radically inconsistent with her own input to Dr. Leimkuhler, provided just six months before – then her description of P.J.'s home-based out-of-control behavior was so extreme as to lead Dr. Leimkuhler to suggest a diagnosis of bipolar spectrum disorder.  P-127-1.

300.8(c)(1)(i).  Faced with a student whose anxiety about going to school has been his primary

obstacle to education, it is plain the District correctly threaded through these regulations in

classifying P.J. as eligible based on an "emotional disorder."  And the District did not limit P.J.'s

services based on the classification; to the contrary, it also focused on executive functioning and

the other learning deficits caused by autism and ADHD, and incorporated goals to address them

into the 2014/2015 IEP.  Vol. IX at 1108.  Based on the foregoing, I recommend that this Court

defer to the hearing officer's well-supported conclusion that the District properly "took into

account the student's primary diagnosis of 'emotional disordered,' as well as other identified

hindrances to his education (mild autism and ADHD)."  Dec. at 29; see Vol. IX at 1108.  There

is no IDEA violation in the District's eligibility classification.

I turn next to the Parent's secondary attack on the 2014/2015 IEP, set out in a list of

procedural and substantive deficiencies with which she claims it is tainted.  Some of them border

on frivolous.  For example, the Parent claims that the IEP does not afford FAPE because the

Wolf School personnel did not attend the last of the four IEP meetings where transition was

discussed.[39]  However, she fails to mention that Wolf staff provided significant input for the IEP

draft and attended the preceding meetings at which transition and the IEP were discussed, which

cumulatively lasted for more than four hours and included meetings in April and May 2014.  See

P-238; P-239; P-240.  Similarly, the claim that the District failed to discuss ESY in the summer

of 2014 is belied by the unrebutted testimony that District staff spoke to the Parent about setting

up ESY tutoring and she failed to follow up.  Vol. XI at 1377-78.  Other claims seem to refer to

---

[39] In considering whether the absence of the Wolf School staff at the June 30, 2014, IEP meeting, held after P.J. was no longer a Wolf student, substantively impacted his education, the Court is constrained to take note of the hearing officer's finding that by the June 30 meeting, the Parent had made the decision to send her son to the Gow School, but had not informed the District.  Dec. at 6 ("In June 2014, the parent unilaterally enrolled the student at The Gow School."); Dec. at 20 ("the mother had already signed a contract for enrollment at Gow on June 24, 2014").  Having listened to the recording of the acrimonious June 30, 2014, IEP meeting, I concur in this finding.  P-241.

matters outside the record, such as the claim that "three doctors have concluded that P.J. has a reading disability."  ECF No. 10-1 at 38.  According to this record, only Dr. Leimkuhler and unknown Gow School educators (who did not testify) diagnosed a reading disability.[40]  The Wolf School teachers declined to do so; Dr. Kotula declined to do so; and Dr. Osowiecki opined that the test results she reviewed do not support a diagnosis of dyslexia or reading disability.  See Vol. X at 1226-29.  Still others are based on a nitpicking comparison of the 2013/2014 IEP and the 2014/2015 IEP focused on the time allocated to various services.  ECF No. 10-1 at 38-39. The Parent fails to point to any credible testimony that these small adjustments would adversely affect P.J.'s education; Ms. Eagan explained that they were the result of the change from a middle school schedule to a high school schedule.  Vol. IX at 1107.

Viewed substantively, all of these critiques fall away in the face of Ms. Eagan's testimony regarding the development of the 2014/2015 IEP, on which the hearing officer properly relied to find that the District's IEP was adequate.  Vol. IX at 1115-17; Vol. XI at 1375-78; see Vol. X at 1231 (Dr. Osowiecki opines that P.J. could receive FAPE at ASA, where District proposed to implement IEP); see also Lt. T.B. ex rel. N.B., 361 F.3d at 82 n.1.  Due to P.J.'s severe anxiety, IEP meetings to discuss the transition to high school and the development of the 2014/2015 IEP were initiated by the District in the fall of 2013.  Dec. at 22.  The hearing officer specifically found that the 2014/2015 IEP was developed as a result of a process that stretched over "numerous lengthy" IEP meetings, that it provided for goals and supports related to speech/language, occupational therapy, mathematics, and transportation, that the District added the executive functioning goals that had been proposed by Dr. Leimkuhler, and that it incorporated the Wolf accommodations that P.J. still needed.  Dec. at 22, 29; see P-206.

---

[40] The only Gow witness, Mr. Cotter, was unable to explain Gow's reading disability diagnosis.  Vol. VII at 718-19.

Based on these findings, the hearing officer concluded that the 2014/2015 IEP offered

P.J. "special instruction designed to meet [his] needs, complete with supportive assistance and

accommodations." Dec. at 29. The primary contrary evidence is from the Parent and her

educational advocate, though the latter lacks the expertise competently to testify to such

opinions. None of the well-qualified experts and educators who testified at the hearing opined to

substantive inadequacies in the 2014/2015 IEP, except for Dr. Kotula, who was critical of the

lack of reading goals. See Vol. III at 296. There is no error in the hearing officer's

determination, which is based on her observation of the demeanor and credibility of the

witnesses and on her weighing of the expert testimony, to reject this opinion in favor of those of

other experts, particularly the educators, who opined that such goals were not necessary. See

Sebastian M., 685 F.3d at 86 (hearing officer's resolution of inconsistencies in testimony of

experts and crediting testimony of educators over outside experts who spent little time with child

is first-instance administrative determination that is entitled to judicial deference); Hartmann,

118 F.3d at 1003-05 (local educators deserve latitude in determining individualized education

program). Based on my independent review of the record, I conclude that the hearing officer's

holding that the 2014/2015 IEP constituted an IDEA-compliant plan that would afford FAPE is

well founded, amply supported by the credible evidence and entitled to full deference.

### ii.      Appropriateness of Placement at ASA

The hearing officer found that the District began transition planning for high school in

late 2013 and that it was explored at the many IEP meetings that followed. Dec. at 6. By early

2014, the District offered the Parent an appropriate placement option at ASA, which is a public

school institution, as well as at a Rhode Island private school, School One, which the Wolf staff

had recommended; in June 2014, it added the Providence Center, which has a strong therapeutic

component.  Dec. at 6; Vol. XI at 1372; see Vol. I at 46.  During this proceeding, the parties and

the hearing officer focused almost exclusively on ASA, the District's new alternative learning

program, which creates the opportunity for students both to learn in a specialized classroom at

their own pace, with a wide array of support services, but also to access whatever general

education and other resources the proximity of the high school may make available, thereby

maximizing the "mainstreaming" goal so central to IDEA.  Roland M., 910 F.2d at 992-93.

The Parent challenged the appropriateness of all three placements.  Because the hearing

officer determined only that ASA would be appropriate, only ASA is discussed here.

The Parent argues that the testimony of Dr. Smith buttresses her argument that ASA is

not able to meet her son's educational needs.  She also claims that the choice of ASA was made

without her input in that she was denied her right to participate in the June 30, 2014, IEP meeting

because it ended before she was able to discuss any placements that I had brought to the table."

Vol. VIII at 846-50; see P-241.  In addition, she relies on an unauthenticated letter purportedly

written by P.J. himself, which states that he "would not step foot on South Kingstown's

property."  Vol. II at 131.  Otherwise, she refused to provide any explanation or reasons for her

belief that ASA was inappropriate; her refusal to provide reasons is based on her thoroughly

repudiated position that the Confidentiality Agreement she signed when she toured ASA barred

her from doing so.[41]

The Parent's contention that ASA is not appropriate because P.J. would refuse to set foot

in any District-owned building may quickly be set aside.  The document in which P.J.

supposedly expressed this sentiment was not authenticated by the witness to whom it was

---

[41] As noted supra, the hearing officer's dramatic rejection of this stonewalling testimony as incredible is well
founded and entitled to deference.  Dec. at 29 ("Without explaining her rationale to the IEP team or to this Hearing
Officer, the parent rejected [ASA] outright, saying only that the child would not attend school in South
Kingstown.").

initially shown (Dr. Smith).  Vol. II at 132 (Q: "Have you seen this before?"  A: "No.").  Nor was it authenticated as written by P.J. when it was shown to the educational advocate.  Vol. V at 528-32 ("His mother scribed [the words] for him.").  Also troubling is the Parent's attorney's reliance on it for the truth of its contents in argument before this Court; with no witness able to authenticate it, the hearing officer explicitly ruled that it was not admitted for the truth.  Vol. V at 532, 536.  No witness with personal knowledge testified either to its authenticity as originating with P.J. or to the truth of the underlying proposition that P.J. "would not step foot on South Kingstown's property."  And Dr. Osowiecki opined that, if P.J. actually had such a fear, it would be better dealt with through treatment to reduce anxiety.  As a consultant to the District, she offered to assist in formulating such a treatment plan.  Vol. X at 1231-33.

Equally unavailing is the claim that the Parent was denied her right to participate at the June 30, 2014, IEP meeting.  Her testimony about what occurred at that meeting and the recording of the meeting simply do not line up.  The recording reveals that, far from being denied the right to participate, the Parent, her educational advocate and her attorney dominated the meeting, while District personnel remained extraordinarily composed in the face of a nit-picking attack on every tittle and jot in the IEP, on the credentials of every educator who contributed to it, and on the absence of the Wolf school staff, despite their full participation in a two-hour-long meeting held just one month prior.  P-240.  The June meeting is punctuated by repeated statements by the Parent and her team that seem to this lay observer like a set-up to present the precise claim that she now is making, rather than a genuine attempt to provide input regarding P.J.'s IEP and placement.  Compare Vol. VIII at 845-52 (Parent's description of June 2014 IEP meeting), with P-241 (recording of June 2014 IEP meeting).  The claim that she could not give her input about placement because the June meeting ended prematurely is frivolous.

Also unhelpful to her cause is the Parent's reliance on Dr. Smith's testimony.  Dr. Smith certainly had the expertise to offer an opinion about ASA's appropriateness for P.J.; he also had some familiarity with ASA, having toured it to assist with P.J.'s high-school placement decision. The problem is that Dr. Smith never said that ASA would not be an appropriate.  To the contrary, while he did testify that the other proposed placements (School One and the Providence Center) were inappropriate, he praised ASA, expressing concern only that P.J.'s anxiety might prevent him from taking advantage of the proximity of the high school.  See Vol. II at 145.

The hearing officer did not end her analysis when she found there was no credible evidence to support a finding that ASA was not appropriate.  See Dec. at 29 ("no evidence of any kind on the record that the ASA was not an appropriate placement").  Rather, she continued, examining carefully the testimony of the educators and experts who looked as ASA and considering whether it would be appropriate for P.J.  For example, she considered the testimony of Ms. Seal, the Wolf teacher who went to ASA for the purpose of evaluating it as a placement for P.J., and praised everything that she saw, observing that it was "indicative of the same programs that they have at The Wolf School."  Dec. at 10; see Vol. I at 49-55.  As the hearing officer noted, Ms. Seal was so impressed that she "stole" some of the ideas for her own classroom.  Dec. at 10; Vol. I at 50.  Similarly, the hearing officer considered Dr. Smith's positive impressions of ASA, despite his concern that P.J. might have difficulty accessing the high school.  Dec. at 12.  More importantly, the hearing officer relied on Ms. Eagan's description of ASA and the extensive accommodations that it offered to meet P.J.'s needs and implement his IEP, coupled with Dr. Osowiecki's unequivocal expert opinion that ASA had "the specialized setting to meet P.J.'s needs" and that P.J. could receive FAPE at ASA.  Dec. at 22, 24; Vol. X at 1231.

78

Based on the foregoing, confirmed by my independent review of the evidence, I find that the hearing officer's conclusion – that ASA is an appropriate placement and "is the least restrictive environment for this student" – is amply supported and entitled to due deference.

### E.    Is the Gow School an Appropriate Placement?

To qualify for tuition reimbursement, the Parent must not only show that the District failed to provide an IDEA-compliant IEP or an appropriate placement at which to implement it, but also that her unilateral choice of an alternative placement – the Gow School – was appropriate.  If she succeeds in proving these elements, she must then demonstrate that equitable factors weigh in favor of reimbursement of the Gow School tuition.  Florence, 510 U.S. at 15; Sch. Comm. of Burlington, 471 U.S. at 369-70.  If this Court adopts my recommended findings that the District's 2014/2015 IEP would have provided P.J. with FAPE, with ASA as an appropriate placement, there is no need for the Court to address whether the Gow School is also appropriate.  Sebastian M., 685 F.3d at 86-87.  Nevertheless, I linger to review the hearing officer's conclusion that it is not.

The hearing officer considered carefully the testimony of the only witnesses with actual knowledge of the Gow School, its admission director, Mr. Cotter, the Parent and Ms. Eagan, who investigated Gow at the Parent's request.  She also considered the expert opinion of Dr. Osowiecki, who questioned the appropriateness of Gow based on its lack of the services required to meet P.J.'s complex needs.  Dec. at 24.  Her holding that Gow is not appropriate is based on its failure to meet the requirement of "least restrictive environment" as a boarding school five hundred miles from P.J.'s peers in the District; its limitation as a school designed for students with dyslexia and language-based deficits, which Dr. Kotula, Dr. Osowiecki and the Wolf

School educators opined P.J. may not even have; and its inability to provide any of the other special education services required by P.J.'s IEP.  Dec. at 29-30.

This holding is firmly grounded in the evidence, starting with Mr. Cotter's testimony about Gow's unilateral focus on reading disorders and lack of special education supports.  Vol. VII at 707, 712-15, 725-26.  Ms. Eagan's opinion that such a placement would not be appropriate was based on her investigation of Gow: "[the Gow admissions officer] told me they were not a special education-endorsed school.  She said that they did not have an occupational therapist or a speech and language therapist . . . It actually doesn't provide special education support and he has numerous diagnoses."  Vol. XI at 1378-79.  Dr. Osowiecki also expressed her concern that P.J. was placed at a school for dyslexic children, rather than a school that would address his other identified needs.  Vol. X at 1254-55.  Based on this evidence, the hearing officer endorsed the District's conclusion that the Gow School would not be appropriate.  See Roland M., 910 F.2d 983 (private school placement chosen by the Parent not appropriate when it lacks diversified, "related services" keyed to student's specific handicaps); N. Reading Sch. Comm., 480 F. Supp. 2d 479 (reimbursement of tuition ordered where district's IEP failed to afford FAPE and unilateral placement had special education credentialed teachers able to meet student's needs).  The uncontroverted facts establishing that P.J. is thriving at Gow and experiencing educational success do not tip the balance – if a private school's chief benefits are the kinds of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not, rather than instruction specifically designed to meet the unique needs of a handicapped child, such benefits do not render it IDEA-appropriate.  Gagliardo, 489 F.3d at 115.

In light of this evidence, all of which was properly considered by the hearing officer, I find no error in her holding that the Gow School is not an IDEA-appropriate placement for P.J.

F.   **Stay-Put**

IDEA stay-put requires that, "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of such child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed." 20 U.S.C. § 1415(j).  Because the Wolf School ends at the eighth grade, the Parent's stay-put argument presents the Court with the legal conundrum that arises when the stay-put placement is no longer available.  Some courts resolve this dilemma by focusing on the use of the term "placement" in § 1451(j), holding that, if the placement is not available, the stay-put remedy also is not available. Wagner v. Bd. of Educ. of Montgomery Cty., 335 F.3d 297, 301 (4th Cir. 2003) (court should simply determine the child's then-current educational placement and enter an order maintaining the child in that placement; error to order school district to seek out alternative placements upon finding of unavailability).  Other courts interpret "placement" to mean "program" and require that the school district must find and offer to the student a program that provides the student with the same benefits as were available in the placement that has lapsed.  F.S. ex rel. Snyderman v. D.C., C.A. No. 06 923(EGS), 2007 WL 1114136, at *5 (D.D.C. Apr. 13, 2007) (if then-current educational placement becomes unavailable, district must provide placement in a similar program during the pendency of administrative and judicial proceedings).

The First Circuit has not clarified the correct approach to stay-put in this circumstance.  However, there is no need for this Court to solve the puzzle.  If the law requires an analogous program, the hearing officer's well-supported holding that the program most analogous to the Wolf School was that embodied in the 2014/2015 IEP with placement at ASA is entitled to due

81

deference.  Dec. at 30 (District's IEP, with supports and accommodations to be delivered at

ASA, "constitutes an appropriate education placement and meets the required elements of stay-

put").  Except for the Parent and her educational advocate, no witness testified otherwise.

Indeed, the Parent's stay-put witness, Wolf School teacher Ms. Seal, who was familiar with both

ASA and the Wolf School, testified that she found that ASA "was similar to [the program]

offered to the student at The Wolf School."  Dec. at 10; Vol. I at 50.  The Parent's argument that

the Gow School is an appropriate stay-put placement while this proceeding is pending was

properly rejected.  I recommend that this Court affirm the hearing officer's determination.

### G.      Parental Right to Participate in Educational Planning

Arcing over all of her complaints is the Parent's contention that everything that the

District has done is tainted because she was not allowed to participate in P.J.'s educational

planning for an array of reasons ranging from the Confidentiality Agreement that prevented her

from talking about ASA, to the presence of the District's attorney at the IEP meetings.  In a well-

supported finding, the hearing officer rejected the Confidentiality Agreement argument as utterly

lacking any credibility; I will not review it again.  With respect to the Parent's claim that the

District's attorney intimidated her, the hearing officer relied on her own observation that the

Parent had no difficulty functioning at the due process hearing in the presence of the District's

attorney.  She explicitly rejected the proposition that it was difficult for the Parent to testify with

the District's attorney there, stating that "[s]he didn't seem that it was that difficult for her."  Vol.

VIII at 903.  To the extent that the Parent alleges that the District was not entitled to include its

attorney in the meetings, RIDE's response to her complaint resolves the issue: "[a]lthough you

disagree with the School Department's attorney attending IEP meetings, by its nature, this

reflects a dispute and cannot be pursued as an alleged violation of regulations."  R-Z.

After listening to hours of recorded IEP meetings and reviewing inches of written correspondence and IEP meeting minutes, the hearing officer found that the Parent's claim that there was any limitation on her right to participate in the IEP meetings and to provide input regarding her son's education in any respect bordered on frivolous.[42] See Vol. IX at 1099-100 ("I have about 12 or 16 hours of tape that clearly shows me the mom knew what she was talking about.").  More importantly, the evidence also establishes that the District did not just passively listen to the Parent's input during the many hours of IEP meetings – rather, it considered her input and, over and over, capitulated or compromised by offering or providing some or all the services she demanded.  Based on this evidence, this Court should affirm the hearing officer and reject the Parent's claim that her right of meaningful participation was impaired in any respect. See Doe v. Attleboro, 960 F. Supp. 2d at 296 (no IDEA violation if school officials listen with open mind to parents' input).

**H.   Failure to Exhaust – Entitlement to Special Education Services after Unilateral Parental Placement**

The Parent's final argument arises from her post-due process demand that, if this Court determines that she is not entitled to reimbursement for the Gow tuition, the District is nevertheless obligated to provide special education services pursuant to R.I. Gen. Laws § 16-24-

---

[42] In all, from the beginning of 2012 through the end of 2014, there were at least thirteen IEP meetings, most lasting for more than an hour, many going for two hours, with most followed by one or more written submissions by the Parent to which the District responded in twenty-one detailed letters written by Ms. Eagan.  See Dec. at 5-6; Vol. X at 1297; Vol. XI at 1392; R-C; R-P; R-AA to R-SS (letters from District to Parent in response to her expressions of input and concern).  Both the District and the Wolf staff considered the number of meetings excessive.  See Vol. XI at 1369-70 (Ms. Eagan testifies that number of IEP meetings "excessive for a student in two years"); P-238 (Wolf staff describe themselves as "getting uncomfortable . . . very uncomfortable").  The recordings of the IEP meetings confirm that the District representatives and the Wolf School faculty in attendance were consistently courteous and listened to the input from the Parent and her educational advocate; indeed, the patience that the District's director of special education displays on some of the recordings is truly laudable.  P-238; P-239; P-241.  This evidence is overwhelming and unrebutted, except by the *ipse dixit* of the Parent and her educational advocate; it establishes that the District did nothing to interfere with the Parent's right to participate, that she did participate and that her input was appropriately considered.

1(c).  This argument raises a legally complex and factually dense issue, involving the appropriate

interpretation of Rhode Island's education law.  No published decisions have yet grappled with

the scope of this responsibility under Rhode Island law.  Cases dealing with analogous

provisions in other states make plain that it is not a simple question.  Doe v. E. Lyme Bd. of

Educ., 790 F.3d 440, 451 n. 9 (2d Cir. 2015), cert. denied, 136 S. Ct. 2022 (2016) (district may

not be required to offer IEP if parent's expressed intent is to enroll child in private school outside

district, without regard to any IEP); C.G. v. Five Town Cmty. Sch. Dist., Civ. No. 05-237-P-S,

2007 WL 494994, at *29 (D. Me. Feb. 12, 2007) (school district cannot be compelled to assume

responsibility for evaluating child while he remains in unilateral out-of-state placement),

adopted, Civ. No. 05-237-P-S, 2007 WL 1051650 (D. Me. Apr. 6, 2007), aff'd sub nom., C.G. ex

rel. A.S. v. Five Town Cmty. Sch. Dist., 513 F.3d 279 (1st Cir. 2008).

        The only information in the record before me is that educational services have not been

provided to P.J. by the District either at the Gow School or when he is home from the Gow

School, but that the discussion of the possibility is ongoing.  Vol. VIII at 91416; Vol. V at 610-

13 (Parent's attorney acknowledges, "[i]t's . . . in front of the commissioner's hearing officer,

and that issue is relative to Rhode Island General Law 16-24-1"); Vol. V at 616 (according to

educational consultant, at the October 2014 IEP meeting, District agreed to consider input from

Gow, but nothing was resolved); Vol. V at 649-62; Vol. VI at 653-64 (educational advocate

describes inconclusive October 2014 IEP meeting); Vol. IX at 1135 ("We have [an IEP for

2015/2016] that we proposed that we're in due process over right now.").  Ms. Eagan testified

that the District understands and will accept its duty under § 16-24-1.  Vol. IX at 1136.  More

importantly, while all of this inconclusive evidence is in the record, the § 16-24-1 issue was not

presented to the hearing officer for decision; accordingly, she did not consider or decide it.[43]  See

Vol. X at 1159-60 (summary of issues to be decided by hearing officer).  Indeed, midway

through the hearing, the Parent's attorney objected to the introduction of post-due process

complaint evidence because it was beyond the scope of the proceeding:

> I presented my case in terms of, as of August 1st, 2014, when we filed this
> complaint, the proposed IEP relative to the 14/2015 school year, it is our position
> did not provide FAPE.  So, I brought information relative to the October 24
> meeting in terms of your needing, if we get to that point, to decide whether The
> Gow School is an appropriate unilateral private placement, but in terms of the
> January 16th meeting and programming and fact, I didn't put on a case to address
> that issue.

Vol. X at 1305.

IDEA's mandatory exhaustion requirement applies to all of the Parent's claims, including

the claim that the District owes P.J. educational services while he is unilaterally placed at Gow.[44]

20 U.S.C. § 1415(i)(2).  The exhaustion requirement prevents courts "from acting as ersatz

school administrators and making what should be expert determination about the best way to

educate disabled students."  Payne v. Peninsula Sch. Dist., 653 F.3d 863, 876 (9th Cir. 2011),

overruled on other grounds by Albino v. Baca, 747 F.3d 1162 (9th Cir. 2014) (en banc).

Exhaustion allows the appropriate state agency to apply its expertise and to develop the record

before judicial review and allows the school district the opportunity to correct errors.  Pachl ex

---

[43] The Parent's post-hearing brief crisply confirms that the issues for decision were precisely those that the hearing officer subsequently decided and no others.  In light of the Parent's own position that post-due process complaint events are beyond the scope of this proceeding, Vol. X at 1305, her counsel's sharp criticism of the hearing officer in her brief in this Court for not deciding this issue is puzzling: "[f]or reasons that she did not articulate, the hearing officer never addressed the issue in her decision."  ECF No. 10-1 at 48.

[44] This is not a case like Fry v. Napoleon Cmty. Sch., 788 F. 3d 622 (6th Cir. 2015), cert. granted, 136 S.Ct. 2540 (U.S. June 28, 2016) (No. 15-497), where the non-exhausted claims arguably arise under IDEA, but were asserted under the Americans with Disability Act and the Rehabilitation Act; whether the IDEA exhaustion requirement applies in that circumstance has been argued and is pending decision before the United States Supreme Court.

rel. Pachl v. Sch. Bd. of Indep. Sch. Dist. No. 11, No. Civ. 02-4065 ADM/AJB, 2005 WL

428587, at *5 (D. Minn. Feb. 23, 2005).

The Parent does not attempt to explain how this plainly unexhausted claim, which

appears to be the subject of an ongoing administrative proceeding and ongoing discussions

between the parties, is ripe for judicial review.  This is not a circumstance where exhaustion

would be futile – to the contrary, the limited information available establishes that the District

has already compromised by holding two IEP meetings and agreeing to consider information

from the Gow School.  See Pihl v. Mass. Dep't of Educ., 9 F.3d 184, 190 (1st Cir. 1993).  As far

as this Court is aware, the dispute conceivably may now be moot.  See Pachl, 2005 WL 428587,

at *6 (parties' subsequent dealings regarding unexhausted claim creates concern that relief

requested is moot).  Nor is this a circumstance where the claim involves a purely legal question –

a determination of P.J.'s ongoing entitlement to services while he is in a unilateral parental

placement is not just a matter of interpreting R.I. Gen. Laws § 16-24-1(c), but also would require

a factually-dense inquiry into P.J.'s needs, the obligation of the District to meet those needs in

New York, what the District is willing to do and what the Parent is willing to accept.  Based on

the Parent's failure to exhaust her administrative remedies, I recommend that the Court dismiss

without prejudice the Parent's post-due process claim that the District wrongfully failed to

provide P.J. with special education services required by R.I. Gen. Laws § 16-24-1(c) after the

Parent unilaterally placed him at the Gow School.

## VI.     ATTORNEY'S FEES

Both parties seek an award of attorney's fees.  Because the Parent has not prevailed on

any issue, her request for fees must be denied.  20 U.S.C. § 1415(i)(3)(B)(i)(I).  I so recommend.

The District's request for an award of some or all of its attorney's fees is a far more complex

matter.  While Congress deliberately set the bar high, providing for a fee award in favor of the school district only in extreme circumstances, this case may clear the bar.

Under 20 U.S.C. § 1415(i)(3)(B)(i)(II), as the prevailing party on every issue before the hearing officer and in this Court, the District may request attorney's fees from the Parent's attorney if the "complaint or subsequent cause of action . . . is frivolous, unreasonable, or without foundation," or if the attorney "continued to litigate after the litigation clearly became frivolous, unreasonable, or without foundation."  Under 20 U.S.C. § 1415(i)(3)(B)(i)(III), the District may seek attorney's fees against either the Parent or her attorney if the "complaint or subsequent cause of action was presented for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation."

I first focus on § 1415(i)(3)(B)(i)(III), which exposes both the Parent and her counsel to an award of attorney's fees if the case was pressed for an improper purpose.  Courts that have considered the applicable standard have concluded that under the IDEA, "[c]ollecting against parents requires a showing of both frivolousness and an improper purpose."  R.P. v. Prescott Unified Sch. Dist., 631 F.3d 1117, 1126 (9th Cir. 2011); Doe v. Attleboro, 960 F. Supp. 2d at 303 ("court cannot conclude that the parent acted with improper purpose").

Over the course of this litigation, the Parent and her educational advocate have critiqued – one might say nitpicked – the District's every effort as inadequate, at the same time that the District and the Wolf School educators seemed genuinely to be trying to keep the focus on what they considered to be in P.J.'s educational interest.  See Bd. of Educ. of Cmty. Consol. Sch. Dist. No. 21, Cook Cty., Ill. v. Ill. State Bd. of Educ., 938 F.2d 712, 718 (7th Cir. 1991) (Wood, J., dissenting) (no one wins and everyone loses when the parents' understandable concern for child leads to parental obstruction exceeding all reasonable bounds despite "the good faith and

87

competent professional efforts and recommendations . . . designed to serve the best educational interests of [student]").  Nevertheless, courts recognize that educational issues can be very difficult for parents who may become entrenched in a belief regarding what their child needs.  Lt. T.B. ex rel. N.B., 361 F.3d at 83.  In this case, the record reflects no more than that the Parent's purpose was consistently to provide P.J. with the best educational services possible.  See Pachl, 2005 WL 428587, at *21.  While her near scorched-earth approach and the lack of candor underlying many of her arguments, including the falsity of portions of her sworn testimony, is very troubling, I cannot find that she acted for any reason other than her perception of what was in the best interest of her son.  Because I do not find that she acted for an improper purpose, to the extent that the District seeks an award of attorney's fees against the Parent or her counsel based on 20 U.S.C. § 1415(i)(3)(B)(i)(III), I recommend that the motion be denied.

The District's motion for an award of attorney's fees against the Parent's attorneys pursuant to 20 U.S.C. § 1415(i)(3)(B)(i)(II) is a closer call.  Such an award lies if the court finds that counsel pursued a complaint that was, in whole or in part, "frivolous, unreasonable, or without foundation."  The District seeks fees for work done to fend off the Parent's attack on P.J.'s education at the Wolf School; for the work done in connection with the claim that P.J. was denied specialized transportation, particularly during 2012/2013; and for the work done in connection with the persistent demand for evaluations that had been barred by the Settlement Agreement and precluded by S. Kingstown I, II.  The District also seeks fees for the work associated with time-wasting testimony of the educational advocate.

Cases in which the court has granted attorney's fees to the prevailing school district defendant are rare and have generally rested upon egregious failures of counsel.  Bobby v. Sch. Bd. of City of Norfolk, 54 F. Supp. 3d 466, 473-75 (E.D. Va. 2014).  For example, fees have

been awarded based on Plaintiff's counsel's "repeatedly prolonging litigation and stonewalling efforts to the detriment of his client." El Paso Indep. Sch. Dist. v. Berry, 400 F. App'x 947, 955 (5th Cir. 2010).  Fees have also been assessed for pursuit of claims so far on the fringe of the IDEA that they were "frivolous, unreasonable, and without foundation ab initio."  Capital City Charter Sch. v. Gambale, 27 F. Supp. 3d 121, 135, 138 (D.D.C. 2014) (describing one false allegation as "breath-taking").  In one case, the plaintiffs alleged that the school failed to develop an appropriate IEP because it did not consult with the student's mother when the record evidence showed that she was present and participated in the IEP meetings.  Bridges Pub. Charter Sch. v. Barrie, 796 F. Supp. 2d 39, 47-48 (D.D.C. 2011).  No reported IDEA cases were found in this Circuit awarding fees against the parent's counsel based on the assertion or continued prosecution of claims that were "frivolous, unreasonable, or without foundation."

As a threshold to the determination of this difficult issue, the Parent's attorney raises an important question: whether a fee award may be assessed against counsel based on the District's counterclaim against the Parent.  This procedural question is the subject of conflicting decisions in other Circuits.  Compare Hawkins v. Berkeley Unified Sch. Dist., 250 F.R.D. 459 (N.D. Cal. 2008) (Fed. R. Civ. P. 13 bars counterclaim for attorney's fees brought solely against non-party attorney), with Taylor P. v. Mo. Dep't of Educ. & Secondary Educ., No. 06-4254-CV-C-NKL, 2007 WL 2360061, at *5 (W.D. Mo. Aug. 14, 2007) (school district may counterclaim for attorney's fees against both parent and non-party attorneys).  In this Circuit, the conflict between Fed. R. Civ. P. 13 and § 1415(i)(3)(B)(i) has been resolved against permitting the school district to prosecute a counterclaim against attorneys who are not parties to the action based on the plain language of Fed. R. Civ. P. 13.  Ms. S. v. Reg'l Sch. Unit 72, No. 2:13-cv-453-JDL, 2014 WL 5314578, at *2 (D. Me. Oct. 16, 2014).  Instead, the Maine court held that the school's fee

petition should be filed post-judgment pursuant to the Local Rule.  Id. (counterclaim dismissed without prejudice "to the school district's right to seek attorney's fees authorized by 20 U.S.C. § 1415(i)(3)(B)(i)(II) in accordance with [the] Local Rule").  In the District of Rhode Island, adopting the approach in Regional School Unit 72 means following the procedure in DRI LR Cv 54.1(a).

In light of the seriousness of a fee award against counsel in such a circumstance, I err on the side of caution.  Mindful of the plain language of Fed. R. Civ. P. 13, I recommend that the Court kick this can down the road a bit, deferring the final determination of whether fees should be awarded until the District makes a motion in accordance with DRI LR Cv 54.1(a).  For now, I recommend that the District's fee motion be denied without prejudice.

## VII.   CONCLUSION

I conclude that the hearing officer correctly held that the District's placement of P.J. at the Wolf School for seventh and eighth grades (the 2012/2013 and 2013/2014 school years) afforded P.J. an IDEA-compliant FAPE.  I conclude that the hearing officer properly held that the District's post-Wolf 2014/2015 IEP, with placement proposed at ASA, was "good enough" to afford FAPE and was compliant with whatever stay-put rights may have been available.  Further, I conclude that the Gow School is not an IDEA-appropriate placement.  Because she has not prevailed on any issue, I conclude that the Parent is not entitled to an award of attorney's fees. In reliance on the finding that the Parent's claim was based on her sincerely-held desire to get the best possible education for her son, I also conclude that the District is not entitled to an award of attorney's fees from the Parent.  As to the District's request for a fee award against the Parent's attorney, I conclude that such a claim cannot be asserted based on the pending counterclaim, but may be asserted pursuant to DRI LR Cv 54.1(a).

Based on the foregoing, I recommend that this Court grant the District's motion for summary judgment and affirm the Decision of the hearing officer, except the motion for recovery of attorney's fees, which I recommend be denied as to the Parent and denied without prejudice as to the Parent's attorney.  I further recommend that this Court deny the Parent's motion for summary judgment, including her request for reimbursement of her attorney's fees.  Finally, I recommend that the Parent's non-exhausted claim under R.I. Gen. Laws § 16-24-1(c) be dismissed without prejudice.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72d.  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
January 11, 2017